DIVISION OF CORRECTIONS, DE-
PARTMENT OF HEALTH & SOCIAL
SERVICES; Alaska Board of Parole;
and State of Alaska, Petitioners,

v.

Warren NEAKOK, and Dorcus Neakok,
as representative survivors, guardians
of any minors and/or Personal Repre-
sentatives of the Estate of Warren Har-
dy Neakok, Jr., and the Estate of War-
ren Hardy Neakok, Jr.; Amy Nukapi-
gak, as representative survivor, guardi-
an of any minor survivors, and/or Per-
sonal Representative of the Estate of
Julia Tukrook, and the Estate of Julia
Tukrook; Walter Toorak, as represent-
ative survivor, guardian of any minor
survivors, and/or Personal Representa-
tive of the Estate of Virginia Toorak,
and the Estate of Virginia Toorak, Re-
spondents.

No. 7230.

Supreme Court of Alaska.

June 20, 1986.

Rehearing Denied Aug. 16, 1986.

Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for petitioners.

Robert H. Wagstaff, Anchorage, for respondents.

Before RABINOWITZ, C.J., BURKE, MATTHEWS and COMPTON, JJ., and SHORTELL, J.*

OPINION

COMPTON, Justice.

On August 18, 1980, while highly intoxicated, Clifford Nukapigak shot and killed his teenaged stepdaughter and her boyfriend, and raped, beat and strangled to death another woman. *Nukapigak v. State*, 663 P.2d 943 (Alaska 1983). The murders took place in Point Lay, an isolated community of less than 100 residents and no resident law enforcement officers. Nukapigak had been mandatorily released from prison six months before the murders, having served a six-year sentence, less statutory good time, for an assault and rape committed in 1975. At the time of the murders he had the status of a supervised parolee,[1] and was reporting by mail to a parole officer.

This case involves a claim for damages against the State of Alaska, the Division of Corrections, Department of Health and Social Services, and the Alaska Parole Board, by relatives of the three persons whom Nukapigak murdered. The plaintiffs claim negligence in failing to impose special conditions of release at the time of Nukapigak's release, to supervise Nukapigak adequately while he was on parole, in allowing him to return to a small, isolated community without police officers or alcohol counseling and in failing to warn his victims of his dangerous propensities. This petition followed the trial court's denial of the state's motion to dismiss or for summary judgment.[2] We affirm in part and reverse in part.

I. FACTUAL AND PROCEDURAL BACKGROUND

Clifford Nukapigak had a history of violence while intoxicated which had led to a series of convictions beginning in 1973. In 1973 and 1974, he was convicted twice for beating his wife. Both incidents occurred while he was so drunk that he did not remember them afterwards. He was convicted in 1975 for raping a woman and stabbing and cutting her vagina. Again, he had been drinking heavily and claimed to have no recollection of his actions. In imposing a six-year sentence for the rape, the trial court considered comments made to a probation officer by Point Lay residents indicating that he had raped other women, beat his wife, and tried to rape his stepdaughter while drunk. *Nukapigak v. State*, 562 P.2d 697 (Alaska 1977). A psychiatric evaluation completed at the time expressed concern that Nukapigak's repressed sadistic impulses made him especially dangerous.

While incarcerated, Nukapigak received four months of individual transactional therapy, and participated in an alcohol treatment program and in Alcoholics Anonymous for some time. His therapist recommended that he receive additional alcohol treatment before he was released. In April and May of 1979, he wrote to Superior Court Judge Gerald J. Van Hoomissen, requesting an order to participate in a comprehensive alcohol program outside of the prison in Fairbanks. Despite Judge Van Hoomissen's approval, he was not allowed to enroll in the program, apparently be-

---

* Shortell, Superior Court Judge, sitting by assignment made pursuant to Article IV, section 16, of the Constitution of Alaska.

1. The mandatory release statute, AS 33.20.-040(a), provides:

   A prisoner serving the term or terms for which the prisoner was sentenced less good time deductions shall be released unconditionally if there remains less than 180 days to serve under the sentence. If there remains more than 180 days to serve under the sentence, a prisoner, upon release, shall be considered as if released on parole until the expiration of the maximum term or terms for which the prisoner was sentenced less 180 days.

   Nukapigak had accrued 707 days of good time.

2. Since this petition is from a denial of the state's summary judgment motion, we must make all factual inferences in favor of Neakok.

cause he had told prison personnel "that he pretty much had the situation whipped." His prison counselor testified that he saw the request as a ruse "just to get out of the confines of the institution for some periods of time."

Despite Nukapigak's claims to have conquered his alcohol problems, at least one prison counselor predicted that he would have trouble with drinking after his release. That counselor was concerned that Nukapigak would be a particular danger to his stepdaughters, whom he had apparently previously assaulted while drunk. She expressed her fears to both the Parole Board and other staff members.

Nukapigak applied for parole and for executive clemency while in prison. Both requests were denied. A 1977 progress report prepared for his parole hearing reported that he had been a good worker, had gotten along well with staff and inmates, and had become very religious. It noted that "there is a serious risk to society if he resumes his drinking" and concluded that his success on parole depended entirely on whether he could refrain from using alcohol.

Nukapigak was released in February 1980 under general parole conditions which required that he obtain employment, obey the law, report to his parole office monthly by mail, and not handle or possess firearms or other weapons. Policy required that Nukapigak's prison counselor formulate a plan for his parole. Nukapigak's parole officer was required by that same policy to review and approve the plan. However, no such plan was developed. The parole officer did not read Nukapigak's prison file until after his release. Parole Board policy to the contrary, prison officials did not forward information regarding Nukapigak to the Parole Board for its use in considering imposition of special conditions of parole. Although both Nukapigak's prison counselor and his parole officer also were authorized to impose special conditions of parole, neither was aware of this authority. Neither imposed such conditions. Consequently, no special conditions of parole

were established for Nukapigak, and he was not prohibited from drinking alcohol.

Nukapigak returned to Point Lay, where he had lived for two years prior to his arrest, and where his wife, child and five stepchildren were living. He obtained a job with the North Slope Borough, and apparently performed well (his parole officer received a letter from his employer in June saying he was doing an outstanding job). He made reports by mail to his parole officer in which he claimed to be readjusting. His parole officer, Louis Gazay, met him only twice: once before his release from prison and once when both men happened to be in Barrow at the same time in July 1980. There was no parole officer assigned to Point Lay and no village resident was appointed as a parole liaison advisor. The Point Lay Village Council and residents of the village were not aware that Nukapigak was under supervision or subject to any conditions of parole.

Apparently Nukapigak did not drink alcohol from the time of his release until August 1980. At that time, in the face of a breakdown in his marriage and other personal problems, he began drinking heavily. On August 16 he traveled to Kotzebue with a friend, and apparently drank continuously during and after this trip. He spent most of August 17 drinking in the homes of various villagers. Late that night he committed the three murders.

The plaintiffs in this case (hereafter collectively referred to as Neakok) are the survivors and personal representatives of the estates of Nukapigak's three victims. They allege seventeen counts of negligence against the State of Alaska, the Division of Corrections of the Department of Health and Social Services (collectively referred to as the state), and the Alaska Board of Parole. These counts fall into four general categories: (1) Failure to supervise Nukapigak adequately or to provide him with treatment and counseling while he was on parole; (2) Failure to consider or impose appropriate special conditions of parole; (3) Failure to warn the residents of Point Lay or Nukapigak's family of his dangerous

propensity to violence; and (4) Failure to provide effective counseling and treatment before he was released.[3]

The defendants moved to dismiss or for summary judgment, claiming that (1) they were immune from Neakok's suit, (2) they owed Neakok no duty to protect him from Nukapigak's acts, (3) they did not proximately cause Nukapigak's acts, and (4) they could not legally have intervened with Nukapigak to the extent proposed by Neakok. The motion was denied, and this petition followed.

■ As the parties have recognized, the central questions in this case are (1) whether the defendants owed a duty to Nukapigak's victims, and (2) whether, even if such a duty was owed, the defendants are immune from liability for any breach of that duty.[4] We conclude that the state did owe a duty to protect Nukapigak's foreseeable victims. We further conclude that the actions (and inactions) of the state's employees which form the basis for Neakok's claims were, in large part, ministerial acts for which the state may be held liable.

## II. DUTY

While the parties have treated the issue of the defendants' immunity as a threshold question, we agree with the California Supreme Court that "[c]onceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity."

**3.** Neakok does not allege that the state was negligent in releasing Nukapigak. His release was mandated by AS 33.20.040.

**4.** Plaintiffs have sued defendants collectively, not segregating theories of liability between them. Defendant Alaska Parole Board has been sued as an entity, individual Board members have not been sued, and no theory of liability specifically addressed to the Board has been asserted. At the time of this incident, the Parole Board was a creature of AS 33.15.010, existing within the Department of Health and Social Services. The Administrative Procedures Act did not apply to the chapter. AS 33.15.250. Prison counselors and parole officers were employees of the Department.

*Davidson v. City of Westminster,* 32 Cal.3d 197, 185 Cal.Rptr. 252, 649 P.2d 894, 896 (1982). We therefore begin our analysis with an examination of the duty the state owed to Neakok.

"Duty," as the word is used in negligence law, "is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." Prosser, Law of Torts (4th ed. 1971) at 325–26. In *D.S.W. v. Fairbanks North Star Borough School District,* 628 P.2d 554, 555 (Alaska 1981), we adopted a list of "considerations" set forth by the California Supreme Court to aid in deciding when, as a matter of policy, a particular plaintiff is entitled to protection. These considerations include foreseeability of harm, the closeness of connection between the defendant's conduct and the plaintiff's injury, the moral blame attached to the defendant's conduct, the policy of preventing further harm, the extent of the burden to the defendant and consequences to the community of imposing a duty of care, and the availability, cost and prevalence of insurance for the risk involved.

### A. *Foreseeability.*

■ The most important single criterion for imposing a duty of care is foreseeability. *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal. Rptr. 14, 22, 551 P.2d 334, 342 (1976). The general rule of negligence law is that a defendant owes a duty of care "to all per-

The legal status of the Board is unclear. However, it is undisputed that (1) prison officials did not forward material concerning Nukapigak to the Board prior to his release; (2) the Board did not become aware of Nukapigak's release until sometime after the fact; (3) the Board was never informed that Nukapigak was violating any term of his general conditions of release so that it might direct his arrest; and (4) the Board was never requested to act by anyone. Thus we conclude that reasonable minds could not differ regarding the absence of fault on the part of the Board, and accordingly summary judgment should have been entered in favor of the Board.

sons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 115 Cal.Rptr. 765, 776, 525 P.2d 669, 680 (1974). Traditionally, however, the common law has not required a defendant to prevent foreseeable harm when, to do so, he or she must control the conduct of another person or warn of such conduct. *Tarasoff*, 131 Cal.Rptr. at 22–23, 551 P.2d at 342–43. This rule has an important exception: When a defendant stands in a special relationship to either the dangerous person or the potential victim, the defendant is required to control the dangerous person or warn or otherwise protect the victim. Restatement (Second) of Torts Section 315 (1965).

■ The state contends that its relationship with Nukapigak was not sufficiently close to give rise to a duty to control him. It argues that a duty to control a third person should be limited to situations where a dangerous person is in the defendant's actual custody or negligently released from custody, or where the hazard is created by the defendant. *See, e.g., Bradley Center v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982); *Grimm v. Arizona Board of Pardons and Parole*, 115 Ariz. 260, 564 P.2d 1227 (1977); *Morgan v. District of Columbia*, 449 A.2d 1102 (D.C.App.1982).

We do not believe that a duty to control or warn can be so narrowly limited. Although the state was required to release Nukapigak, he remained under state supervision as a parolee. It could regulate his movements within the state, require him to report to a parole officer under conditions set by that officer or a prison counselor, require him to undergo treatment for alcoholism, and impose and enforce special conditions of parole including requirements that he refrain from the use of alcohol, participate in an alcohol rehabilitation program, and that he consent to a search of his residence to see if he possessed firearms. It could revoke his parole and reincarcerate him if he violated these conditions.[5] While the state could not completely control Nukapigak's conduct, it was hardly in the position of a stranger who (at least according to the traditional rule) cannot be expected to interfere with the conduct of a third person.

Moreover, the special relationship between Nukapigak and the state was not solely defined by Nukapigak's status as a parolee. Prior to his release, Nukapigak was incarcerated for over four years. During that time, close observation had led at least one prison counselor to conclude that Nukapigak presented a special danger to his stepdaughters, and had caused other corrections personnel to suggest that he would be dangerous to society if he resumed drinking. The state's enhanced ability to observe the conditions under which a prisoner might be expected to be especially dangerous increases its potential ability to limit his dangerousness as a parolee.

The state thus stands in a special relationship with a parolee, both because of its increased ability to foresee the dangers the parolee poses and because of its substantial ability to control the parolee. Given this special relationship, it is not unreasonable

---

5. At the time of Nukapigak's release, there was apparently some confusion among parole officers and prison counselors as to whether special conditions of parole could be imposed on mandatory releasees. This confusion stemmed from dicta in a plurality opinion in *Morton v. Hammond*, 604 P.2d 1 (Alaska 1979), which suggested that the parole of a mandatory releasee could be revoked for violation of statutory conditions of parole, but that special conditions could not be imposed. However, the Parole Board and the Division of Corrections did not change their policies in response to *Morton* and continued to treat mandatory releasees identically with other prisoners.

We agree with the concurring opinion of Rabinowitz, C.J. and Matthews, J. in *Morton*, 604 P.2d at 4, and with the more recent decision of the court of appeals (*Braham v. Beirne*, 675 P.2d 1297 (Alaska App.1984)), that mandatory releasees, who are "considered as if released on parole" (AS 33.20.040) are subject to the same conditions of parole as any other parolee. We therefore conclude that the parole of a mandatory releasee may be revoked if he or she violates special conditions of parole.

to impose a duty of care on the state to protect the victims of parolees.[6]

The courts of a number of other jurisdictions have imposed a duty to protect the potential victims of a third party on persons or institutions with a special relationship with that third party. In the landmark case of *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), the California Supreme Court held that the special relationship between a psychotherapist and a patient imposes on the therapist a duty to act reasonably to protect the foreseeable victims of the patient. In *Rieser v. District of Columbia*, 563 F.2d 462 (D.C. Cir. 1977), modified on other grounds on hearing *en banc*, 580 F.2d 647 (D.C. Cir. 1978), the District of Columbia Circuit Court of Appeals held that the special relationship between a parole officer and a parolee imposed a duty on the parole officer to protect the parolee's potential victims. In *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir.1976), *cert. denied* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976), it was held that a court probation order imposed on a state hospital a special relationship with a patient which required the hospital to protect the public from him. *See also Johnson v. State*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968); *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb. 1980); *Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983). The relationship between the state and a parolee is comparable to the relationship found sufficient in each of these cases to justify the imposition of a duty to control a third person.

■ Having decided that the state may be required to use due care to control the actions of a third party, we turn to the question of whether the injury to Neakok was a foreseeable hazard of its failure to use due care in supervising Nukapigak. As we noted at the outset, consideration of the foreseeability of injury is central to a determination of whether a duty of care exists. The state may be held liable for its failure to act reasonably and carefully only if it could have foreseen that its failure to do so might cause harm to Neakok.[7]

■ Article I, section 12 of the Alaska State Constitution requires that penal administration be "based upon the principle of reformation and upon the need for protecting the public." We have held that the public is an intended beneficiary of this article. *Abraham v. State*, 585 P.2d 526, 531 (Alaska 1978). The state is thus required to consider public safety in its administration of the parole system, and to supervise parolees in such a way that danger to the public is minimized. "Due care" in supervising parolees and in planning for their parole is defined in part by the need to protect the public from dangerous parolees. In light of this constitutional framework, it is difficult to accept the argument that harm to the public is not a foreseeable consequence of the failure to exercise due care.

The state regulations, policies and procedures governing the parole and supervision of mandatory releasees provide a number of avenues through which "due care" may be defined. At the time Nukapigak was released, state policy required that a release plan be formulated for each parolee, and that his or her field officer investigate it for authenticity and to determine wheth-

6. It is possible that the state could not have protected Neakok without exercising greater control than would have been permissible. Neakok's claim alleges, however, that the state failed to use due care in exercising whatever control it legitimately did have over Nukapigak. Whether the murders would have occurred but for this alleged failure is a question of causation rather than of duty. We cannot conclude that, as a matter of law, the state should be excused from a duty to exercise that limited control carefully merely because it was not unlimited.

7. While a specific case-by-case determination of foreseeability and causation lies within the province of a jury, the existence of a duty is a question of law. *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121, 124. In deciding whether Nukapigak's criminal acts were a "foreseeable" risk of a failure to use due care, we do not determine whether, under the specific facts of this case, state employees should have foreseen that the murders would occur.

er it was the best plan available. This investigation included verification of the parolee's proposed address and place of employment. A Parole Board directive also required that special conditions of parole be considered for all releasees who had been convicted of crimes of violence, who had physically injured their victims, or who had been sentenced to an effective sentence of more than five years. Under these special conditions, Nukapigak could have been required to refrain from drinking, participate in an alcohol rehabilitation program, or to live in a community with appropriate supervisory personnel. The evidence Neakok has submitted indicates that either Nukapigak's prison counselor or his parole officer could have imposed special conditions of parole. In addition, Parole Board regulations allowed the appointment of a local resident as a parole advisor to work with a parolee and report specific events to his parole officer.

It should not be difficult to foresee that the failure to use due care in following these procedures, and in supervising a parolee after his or her release, might result in harm to the public. In Nukapigak's case, the potential effects of a failure to use due care appear especially clear. Nukapigak had committed violent crimes against both relatives and strangers while intoxicated. He had been identified by a

number of sources as a potential danger to society if he resumed drinking. A psychological evaluation had cautioned that "because his explosive personality is so ingrained, Clifford is likely to have continuing problems maintaining [his] newly learned self-discipline and control in a nonstructured environment if he continues drinking." In light of this information, it was not unforeseeable that if Nukapigak was not supervised or given counseling, and if he was allowed access to alcohol and firearms, he might act violently toward those around him.[8]

The state argues that, even if it could have foreseen that a failure to supervise Nukapigak carefully might have endangered the public at large, it owed no special duty to Neakok. It contends that it could not have identified Nukapigak's specific victims and that it therefore owed them, as members of the public, no actionable duty.[9]

■ The question of whether a duty to control a dangerous person may be imposed when the dangerous person's victims cannot be specifically identified has divided the jurisdictions that have considered it. Although the *Tarasoff* court did not emphasize the identifiability of the victim, subsequent California cases have refused to impose a duty except to readily identifiable victims. *See Thomas v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70,

8. We cannot accept the state's assertion that the murders were not foreseeable because Nukapigak has never killed before and because Nukapigak was convicted of intentional murder and could not therefore have acted in a drunken stupor. Neakok has submitted evidence that indicates that the state was on notice that Nukapigak was violent and uncontrollable when drunk. In light of this knowledge, it was not unforeseeable that, if he became drunk, he would commit violent crimes. The state's inability to predict the exact nature of these violent crimes or the exact degree of his intoxication while committing them does not absolve it of a duty to act reasonably to prevent them.

9. To the extent that the state argues that it cannot be held liable to an individual for breach of a duty owed to the public at large, its argument must be rejected. We expressly disavowed the "duty to all, duty to no one" doctrine—providing that the state may owe a duty

only to persons with whom it has a special relationship—in *Adams v. State*, 555 P.2d 235, 241–42 (Alaska 1976):

[W]e consider that the "duty to all, duty to no one" doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. An application of the public duty doctrine here would result in finding no duty owed the plaintiffs or their decedents by the state, because, although they were foreseeable victims and a private defendant would have owed such a duty, no "special relationship" between the parties existed. Why should the establishment of duty become more difficult when the state is the defendant? Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not.

(Footnote omitted).

614 P.2d 728 (1980). Other courts have held that a duty of care may be owed to anyone within a "class of persons" foreseeably put at risk.[10] Thus, in *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185, 195 (D.Neb.1980), it was held that a psychiatric hospital owed a duty to protect anyone foreseeably endangered by a patient and could therefore be held liable for the deaths caused when the patient shot into a crowd in a nightclub. In *Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230, 237 (1983), the Washington Supreme Court held that a state psychiatric hospital could be held liable to a persons injured in a car crash by a patient it had negligently treated. In both cases the specific identify of the victim was wholly unforeseeable, even if the harm caused was not.

We agree with those courts which have held that the inability to predict the special victim of a dangerous person does not absolve a custodian from a duty to use due care to protect others who might foreseeably be endangered by that person. Where the state, through its negligence, allows a parolee to cause foreseeable harm to a third person, we see no reason to predicate liability wholly on the state's ability to predict the victim's name. A victim may be "foreseeable" without being specifically identifiable.

The victims in this case, moreover, were foreseeable as more than simply members of the general public. All three were residents of an isolated community of fewer than 100 residents [11] into which Nukapigak was released. One of them was one of Nukapigak's stepdaughters; the others were her boyfriend and her aunt. Nukapigak's stepdaughters had been identified by at least one prison employee as particularly at risk. If they were foreseeably endangered, their close friends and relatives may also have been within a zone of especially foreseeable victims.[12]

■ We conclude that both Nukapigak's victims and his actions were within the zone of foreseeable hazards of the state's failure to use due care in supervising Nukapigak. A trier of fact may decide that, under the circumstances, state employees' use of care in supervising Nukapigak or in planning and administering his parole could not have prevented the murders, or that the state did, in fact, act reasonably. We cannot conclude as a matter of law, however, that the murders or the victims were sufficiently unforeseeable to relieve the state of liability for the consequences of its negligence.

B. *Other Criteria.*

The remaining *D.S.W.* criteria, on balance, also militate in favor of imposing a duty of due care on the state. There is no question that the plaintiffs suffered injury; the asserted failure to supervise Nukapigak adequately—if proved at trial—can be viewed as closely connected to that injury. The state's abrogation of its own responsibility for adequately supervising this particularly dangerous parolee—if proved at trial—cannot be characterized as anything but morally blameworthy. A rule imposing liability for such derelictions would, in all probability, aid in deterring such conduct in the future.

**10.** We note that the California cases that have limited a duty of care to identifiable victims have focused on the duty to warn. The special considerations surrounding imposition of a duty to warn may justify limiting its scope. *See infra* at 1130.

**11.** Point Lay had a total population in 1980 of from thirty to sixty-eight residents. Alaska, Description of Resources in the Cities and Villages [Criminal Justice Planning Agency, October 1981] sets the figure at thirty. Alaska's 1980 Population, a Preliminary Look, [Alaska Dept. of Labor, January 1, 1981] estimates the village's population at sixty-eight.

**12.** *Cf. Hedlund v. Superior Court,* 34 Cal.3d 695, 194 Cal.Rptr. 805, 669 P.2d 41 (1983). In that case, the California Supreme Court held that a psychotherapist was under a duty to protect the young son of a woman who had been identified as a potential victim of a mental patient. The court noted that it was not "unreasonable to recognize the existence of a duty to persons in close relationship to the object of a patient's threat, for the therapist must consider the existence of such persons both in evaluating the seriousness of the danger posed by the patient and in determining the appropriate steps to be taken to protect the named victim."

The state argues that the burdens and consequences of imposing financial liability for failure to supervise adequately would be severe and unwarranted. It claims that the imposition of such a duty would cause "intolerable judicial interference with judgmental corrections' decisions" and impose an economic burden, "reordering state priorities in allocating manpower and funds" and causing other socially desirable programs to suffer. We are not convinced by the generalized arguments the state has presented on this issue. By imposing a duty of due care on corrections personnel we are not requiring that the state spend limitless sums of money taking every conceivable precaution to prevent any possible violent action on the part of any parolee. We merely conclude that state officials have the duty, within the confines of existing policies and budgetary constraints, to exercise due care in supervising parolees. We do not believe that a rule imposing such a duty will significantly expand the responsibility of the state to the public and to its parolees; it might, however, convince state officials of a need to consider more carefully the decisions they make that might have potentially disastrous consequences.

■ We therefore hold that state corrections personnel have the duty to use due care in supervising parolees and in protecting the foreseeable victims of parolees they know, or reasonably should know, to be dangerous.[13] This duty requires that such officials take whatever precautions that a reasonable person with their knowledge and authority would take. We emphasize that the recognition of the duty does not make the state liable for all harm caused by parolees, but rather makes it liable only when its negligent supervision and administration of their parole causes the injury in question. *See Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185, 192 (D.Neb.1980).

Neakok has alleged that the state was negligent, not solely in failing to supervise Nukapigak adequately, but also in failing to warn his victims and the residents of Point Lay that he was dangerous. The state contends that it had no duty to warn Nukapigak's potential victims, both because it could not predict who they were, and for policy reasons.

Ordinarily, the duty to use reasonable care to protect the foreseeable victims of a dangerous person may require a third party to take one or more of various steps, depending on the nature of the case. "Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." *Tarasoff,* 131 Cal.Rptr. at 20, 551 P.2d at 340. The cases that have held that warnings may be appropriate, however, have generally involved specifically identifiable victims. *See, e.g., Tarasoff; Jablonski by Pahls v. United States,* 712 F.2d 391 (9th Cir.1983). These cases have concluded that the policy reasons against issuing warnings are overshadowed when they can be limited to, and substantially protect an identified potential victim.

■ We recognize that a requirement of warnings, unlike a requirement of careful supervision, carries with it the danger that a parolee will be stigmatized and rehabilitation thus seriously impaired. We have no interest in requiring, as a matter

**13.** We recognize the difficulties inherent in a requirement that prison authorities accurately predict the potential dangerousness of released prisoners. *Cf. Tarasoff,* 131 Cal.Rptr. at 24–25, 551 P.2d at 344–45. *See also* Diamond, The Psychiatric Prediction of Dangerousness, 123 U.Penn.L.Rev. 439, 451 (1974). We do not intend to impose such a requirement. We do believe, however, that prison officials may be required to take into account the known characteristics of those they supervise when formulating plans for parole and in carrying out the actual supervision of parolees. In a similar context, the California Supreme Court noted that

Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is unsufficient to establish negligence.

*Tarasoff,* 131 Cal.Rptr. at 25, 551 P.2d at 345.

of law, that potentially dangerous parolees be emblazoned with scarlet letters[14] proclaiming their status and criminal history before they are released from prison. Therefore, if Nukapigak's victims were foreseeable only as members of a limitless class of unidentifiable victims of foreseeably dangerous behavior, we would not impose a duty to warn.

Nukapigak's victims were not unidentifiable, however. As we have already noted, their status as residents of this small, isolated community, and as the stepdaughter and the close friends and relatives of the stepdaughter of Nukapigak make them significantly more "identifiable" than members of the general public would be.[15] Moreover, as residents of a community without police or parole officers, they may have had a much greater need for warnings than would a resident of a city with better access to traditional mechanisms of social control.

The California Supreme Court set forth its reasons for refusing to impose a duty to warn where a specific victim was not identifiable in *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). The state argues that the circumstances of this case are substantially similar to those at issue in *Thompson,* and urges us to find guidance in that case. In *Thompson,* the court held that the authorities responsible for releasing a juvenile offender who had threatened to murder an unidentified child in his mother's neighborhood had no duty to warn the parents of neighborhood children. It based its holding in part on a belief that requiring warnings in that case would be "unwieldy and of little practical value," producing "a cacaphony of warnings that by reason of their sheer volume would add little to the effective protection of the public." *Id.* 167 Cal. Rptr. at 77, 614 P.2d at 735. The court added that "the generalized warnings sought to be required here would do little to increase the precautions of any particular members of the public who may already have become conditioned to locking their doors, avoiding dark and deserted streets, instructing their children to beware of strangers and taking other precautions." *Id.* 167 Cal.Rptr. at 78, 614 P.2d at 736.

In contrast to the circumstances at work in *Thompson,* warnings in this case would not necessarily have been either unwieldy or ineffectual. The difficulties inherent in deciding which of the residents of a densely populated urban area to warn, and the dangers of a "cacaphony of warnings" disappear when the community at issue has 68 residents. It is not unreasonable to imagine that the residents of a small, isolated community have not become conditioned to protecting themselves from random violence, and that they might be much more profoundly affected by warnings. Moreover, the possibility of issuing discrete warnings to persons in a position to use them effectively is much more realistic in a village like Point Lay than in a relatively anonymous urban neighborhood. Under these circumstances, we cannot conclude that, as a matter of law, a requirement of warnings would be unduly burdensome, futile, or counterproductive.

Other factors present here, and absent in *Thompson,* militate against precluding a finding that the state, had it exercised due care, would have warned Nukapigak's foreseeable victims. When the state releases a potentially dangerous parolee into an isolated community without either police or parole officers, it may reasonably be expected to take some action to protect the residents. The state contends that, because of budgetary constraints, this protective action cannot include the assignment of a parole officer to the community or the

---

**14.** *See* N. Hawthorne, The Scarlet Letter (1850), in which the protagonist, Hester Prynne, was forced to wear a scarlet "A" on her clothing as punishment for having committed adultery.

**15.** Several courts have ruled that a duty to warn may be found where a third party has information which should have put it on notice that an identifiable potential victim was in danger. *See Jablonski by Pahls v. United States,* 712 F.2d at 398; *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. at 189, n. 3.

requirement that an officer visit the parolee there periodically. We are unwilling to hold that, under these circumstances, the state's duty of care could not require it to inform the residents of the conditions of a releasee's parole and of any information which leads it to believe he or she might be dangerous.[16]

Although the California court refused to impose a duty to warn under the facts of *Thompson*, it did note that "[i]n those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim *or group of victims* who can be effectively warned of the danger, a releasing agent may well be liable for failure to warn such person." *Thompson*, 167 Cal.Rptr. at 80, 614 P.2d at 738 (emphasis added). We conclude that the residents of a small remote village may constitute a "group of victims" who are sufficiently identifiable to justify imposing a duty to warn. We therefore hold that, if Neakok can prove that the state knew or reasonably should have known that the residents of Point Lay, or Nukapigak's ultimate victims, were seriously endangered when Nukapigak was released into Point Lay, the state's duty of due care may have included a duty to warn them of the danger.[17]

In conclusion, the state had a legally imposed duty to supervise Nukapigak, and a concomitant authority to impose conditions on his parole and to reincarcerate him if these conditions were not met. It thus exercised substantial control over

him. We hold that, in exercising this control, the state was obligated to use reasonable care to prevent Nukapigak from causing foreseeable injury to other people. Whether the state breached its duty of care by failing to supervise Nukapigak more closely, to impose special conditions of parole, to warn the residents of Point Lay of his dangerous propensities, or to take other protective measures is a question of fact which a jury must decide.[18]

### III. IMMUNITY

Even if the state owed a duty of due care to Nukapigak's foreseeable victims, it cannot be held liable for the breach of that duty if it is immune under the "discretionary function" exception set forth in AS 09.50.250. AS 09.50.250 provides in part:

A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court.... However, no action may be brought under this section if the claim

(1) ... is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused; ...

The state contends that all of the decisions made in connection with Nukapigak's supervision and conditions of parole were dis-

---

**16.** The Chairman of the Parole Board testified to the Board's approach when an unrehabilitated prisoner is paroled as a mandatory releasee:
[I]f it's in a remote situation, we throw up our hands, and if its in Anchorage, we tell the P.O. that we want him to notify the police and everybody concerned that this person is out, is on mandatory release and that they need to do whatever they can do to try to make sure that they don't get involved in something too serious before we pick them back up.

**17.** Our holding does not necessarily impose a duty to warn on the state. Instead, we merely hold that the trier of fact is not precluded from finding that the state, had it acted reasonably,

would have issued warnings to the victims or to the residents of Point Lay.

**18.** Neakok's complaint alleges that the state was negligent in failing to provide Nukapigak with effective treatment for alcoholism and violence while he was in prison. Neither party mentions this count in its brief. We conclude that the state's treatment of Nukapigak before his release is too remote from Neakok's injuries to give rise to a duty to Neakok. While the state may well have owed Nukapigak a duty to offer rehabilitative programs in prison, we are unwilling to hold the state liable to Neakok for its failure to rehabilitate Nukapigak.

cretionary, and that it is therefore immune from any liability.[19]

In interpreting AS 09.50.250, we have consistently held that "liability is the rule, immunity the exception." *Johnson v. State*, 636 P.2d 47, 64 (Alaska 1981); *Japan Air Lines Co. v. State*, 628 P.2d 934, 937 (Alaska 1981); *Adams v. State*, 555 P.2d 235, 244 (Alaska 1976). We have recognized that the purpose of the exception is "to preserve the separation of powers inherent to our form of government by recognizing that it is the function of the state, and not the courts of private citizens, to govern." *Japan Air Lines Co.*, 628 P.2d at 936. This purpose is served when the planning and policy decisions of other branches of government are insulated from liability. *See, e.g., Wainscott v. State*, 642 P.2d 1355 (Alaska 1982). On the other hand, however, "not all decisions or acts of state employees fall within the exception;" rather, immunity attaches "only '[w]here there is room for *policy* judgment and decision.'" *Japan Airlines Co.*, 628 P.2d at 936 (emphasis in original), *quoting Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427, 1441 (1953).

In distinguishing between protected and unprotected levels of government decision making, we have followed a number of jurisdictions in holding the government liable for its "operational" decisions, but not for decisions made at a "planning" level. Under this planning-operational test, only decisions that rise to the level of basic planning or policy formulation will be considered discretionary; decisions that implement policy decisions and are ministerial or operational in nature will not be immune. *Johnson v. State*, 636 P.2d at 64; *State v. I'Anson*, 529 P.2d 188, 193 (Alaska 1974).

In adopting the planning-operational test, we followed the California Supreme Court in rejecting "simple semantic inquiry into the meaning of the word 'discretionary,'"

since "almost any act, even driving a nail involves some 'discretion.'" *State v. Abbott*, 498 P.2d 712, 720 (Alaska 1972), *quoting Johnson v. State*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968). We concluded that the planning-operational test "has the analytic virtue of focusing on the reasons for granting immunity to the governmental entity," and is therefore "a well-reasoned approach to the problem." *State v. Abbott*, 498 P.2d at 721. The test's focus allows it "to give legislative and executive policymakers sufficient breathing space in which to perform their vital policy making functions," *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 30, 551 P.2d 334, 350 (1976), while avoiding the immunization of every minor exercise of discretion. Since adopting the planning-operational test we have refused to immunize even acts that involve substantial exercise of discretion, but that did not rise to the level of policy decisions. *See, e.g., Moloso v. State*, 644 P.2d 205, 219 (Alaska 1982).

In view of these guidelines for applying the discretionary function exception, we cannot accept the state's argument that all decisions that concern parole are discretionary and must be immunized. The state argues that parole decisions necessarily require sensitive balancing of competing interests of rehabilitation and public safety and are, by their nature, policy decisions. However, Neakok's claims against the state are based primarily on day-to-day acts of corrections personnel. These employees were not involved in basic policy making; they were instead assigned to implement the policies passed down to them by the Parole Board and by their superiors or required of them by the basic tenets of negligence law. In describing their decisions as involving policy making, the state has, in our view, substituted the words

---

**19.** The Parole Board argues that the decisions of the Board are policy decisions and must be immunized. Parole Board members, as distinguished from parole officers, have frequently been afforded quasi-judicial immunity from liability for their decisions. *See Pope v. Chew*, 521 F.2d 400 (4th Cir.1975); *Pate v. Alabama Board* *of Paroles*, 409 F.Supp. 478 (M.D.Ala.1976). In this case either the parole officer or prison counselor also could have imposed special conditions of parole. In view of our disposition of the claim against the Parole Board, we need not address the issue of immunity.

"policy making" for the word "discretionary," and proceeded with the essentially semantic inquiry rejected in *Abbott* and *Johnson*. While the employees assigned to supervise Nukapigak made decisions involving some discretion, they cannot be said to have made policy. As we have already noted, we have not interpreted AS 09.50.250 as immunizing all decisions requiring the exercise of some degree of discretion.

■■■■■■ The policies of the Parole Board required Nukapigak's prison counselor to formulate a parole plan for him before he was released. They also authorized both the counselor and Nukapigak's parole officer to impose special conditions of parole. Possible special conditions included requirements that Nukapigak refrain from drinking alcohol, that he participate in an alcohol rehabilitation program or marital counseling, or that his residency be set in a place (e.g., Barrow) where there were law enforcement officers and treatment programs to supervise him. Formulation of the parole plan, and selection of special conditions were not basic planning or policy making activities that would be immunized under AS 09.50.250. Instead, they implemented a policy already devised by the Parole Board. While the discretionary function exception immunizes the formulation of policy, the state may be held liable if that policy is negligently implemented. *State v. I'Anson*, 529 P.2d at 194.

Similarly, the actions of Nukapigak's parole officer in supervising him, and in deciding not to appoint a parole liaison advisor, not to inform appropriate people in the small community of Point Lay of his parole status, and not to warn his stepdaughter and other potential victims of his dangerous propensities cannot be characterized as basic policy decisions. Employees of the Division of Corrections were charged with supervising Nukapigak while he was on

parole. Their actions in carrying out that duty took place "at the lowest, ministerial rung of official action," *Tarasoff*, 131 Cal. Rptr. at 30, 551 P.2d at 350, *quoting Johnson v. State*, 73 Cal.Rptr. at 250, 447 P.2d at 362, and cannot be immunized.

We find support for a holding rejecting immunity in several well reasoned decisions of other courts. Under circumstances comparable to those at issue here, a number of jurisdictions have refused to shield operational decisions of parole officers, probation officers, and government employed custodial officers. Thus, for example, in *Johnson v. State*, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968), the California Supreme Court refused to immunize a parole officer's failure to warn a juvenile parolee's foster parents of his dangerous propensities. The court acknowledged that the parole officer exercised discretion in selecting "those elements of the youth's character and background which would be most helpful to the foster parents and yet would not endanger the parole effort," *id.* 73 Cal.Rptr. at 245, 447 P.2d at 357, but concluded that such "discretion did not rise to the level of policy formation." In *Rieser v. District of Columbia*, 563 F.2d 462, the court held that the District of Columbia was not immune from suit for a parole officer's failure to warn a parolee's employer of his criminal record and to supervise him adequately. The court specifically noted that the parole officer "was not involved in the formulation of policy, but in the execution of policy as it affected an individual parolee." *Id.* at 475. *See also White v. United States*, 317 F.2d 13 (4th Cir.1963) (Veteran's Administration Hospital administrators' decision to allow mental patient privileged status not immune); [20] *Tarasoff*, 131 Cal.Rptr. at 22, 551 P.2d 334, (state-employed psychiatrists' decision not to warn their patient's identifiable victim not im-

---

**20.** The *White* court noted that:

While the policy embodied in the Veteran's Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to

an individual case is not within the category of policy decisions exempted by the [Tort Claims] statute. The application of that policy to the individual case is an administrative decision at the operational level....

317 F.2d at 17.

mune); *Bellavance v. State,* 390 So.2d 422 (Fla.App.1980) (State hospital administrators' decision to release mental patient not immune).

The policies of the Division of Corrections and the Parole Board as well as the Alaska Constitution impose a body of operational duties on the Division and its personnel. These laws and policies require the Division and its personnel to supervise parolees adequately, and give them authority to create individualized plans of parole, to appoint parole advisors and otherwise to dictate terms and conditions of parole. Many of these activities require the exercise of some judgment, but none are policy decisions.

Accordingly, actions taken by personnel of the Division of Corrections to fulfill their duty to follow the policies of the Division and the Parole Board, and to supervise parolees adequately, should be scrutinized under established principles of negligence law. This analysis does not render the choices facing a parole officer irrelevant. In *Johnson v. State,* 73 Cal.Rptr. at 358, 447 P.2d at 358, the California Supreme Court noted that its rejection of a literal interpretation of "discretionary"

> merely implies that the existence of some ... alternatives facing the employee does not perforce lead to a holding that the governmental unit thereby attains the status of non-liability under [the discretionary function exception]. These alternatives may well play a major part in the resolution of the substantial question of negligence; they do not, however, dispose of the threshold question of immunity.

The need to make decisions about Nukapigak's supervision in the light of competing considerations about his successful parole and the protection of the public must be considered in deciding whether state employees in fact acted negligently. If these decisions were made reasonably and carefully, the state will not be held liable even if, in retrospect, an alternative decision might have averted the murders. We cannot conclude, however, that the availability of these choices should immunize the state entirely for its failure to use due care in supervising Nukapigak.

## IV. CAUSATION

▮ The state argues that, even if it breached a duty to Neakok and is not immune from liability for that breach, its actions were not a proximate cause of the murders. It contends both that the connections between its acts and the murders were too attenuated to support a finding of proximate cause and that Nukapigak's acts were an independent intervening cause which relieved the state from liability. The question of proximate cause becomes one of the law only "where the evidence is such that reasonable minds cannot differ." *Sharp v. Fairbanks North Star Borough,* 569 P.2d 178, 183–84 (Alaska 1977). The evidence in this case does not preclude a finding of causation by a reasonable jury, and we therefore cannot hold that, as a matter of law, the state's alleged negligence did not cause the murders.

A party's negligence is a proximate cause of an injury only when the negligent act "was more likely than not a substantial factor in bringing about [the] injury." *Sharp,* 569 P.2d at 181. Normally, the substantial factor test may be satisfied only by a showing "both that the accident would not have happened 'but for' the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach responsibility to it." *Id., quoting State v. Abbott,* 498 P.2d at 726–27.

The state contends that the murders would have occurred even if it had exercised due care, and that its alleged negligence is therefore not a "but for" cause of harm. We cannot say, as a matter of law, that reasonable jurors could not believe that if Nukapigak's wife had been warned of the danger she would not have protected her daughter, that if the villagers had been warned they would not have helped him to obtain alcohol, that if Nukapigak had been prohibited under his conditions of parole

from drinking, he would not have become drunk, or that, if a local parole advisor had been appointed, Nukapigak's possession of firearms would have been prevented or reported. Reasonable jurors could certainly find that, without alcohol or firearms, the murders would not have happened.

■■■ The state also contends that Nukapigak's acts themselves were a superseding cause of Neakok's injury and that the state should therefore be relieved from liability for its own alleged negligence. The Restatement (Second) of Torts Section 440 (1965) suggests several factors which may be considered in establishing the existence of a superseding cause of an injury which will relieve a negligent actor from liability. These standards include: (1) the fact that the intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (2) the fact that the result appears highly extraordinary after the event; (3) the fact that the intervening force operates independently of the actor's negligence; (4) the fact that the operation of the force is due to a third party's acts, especially if that act is wrongful; and (5) the degree of culpability of the third person's acts. These standards do not support a conclusion that Nukapigak's acts were a superseding cause of Neakok's injury. The state's duty to supervise Nukapigak adequately and to impose special conditions of parole on him was intended, in part, to protect the public and to prevent Nukapigak from committing new crimes. Indeed, if the state owed any duty to Neakok, it was to use reasonable care to prevent Nu-

kapigak from committing new crimes. Nukapigak's actions, although highly culpable, were not unforeseeable or independent of the state's negligence.[21] Under these circumstances Nukapigak's acts cannot be viewed as a superseding cause of Neakok's injury. *Cf. Morris v. Farley Enterprises, Inc.*, 661 P.2d 167 (Alaska 1983).[22]

## V. CONCLUSION

In bringing this action, the survivors of Nukapigak's victims have claimed that the state's negligent supervision and treatment of a dangerous parolee allowed that parolee to commit three foreseeable and avoidable murders. By its motion for summary judgment, the state contends that, even if it was negligent, it cannot be held liable for its negligence because it had no duty to protect the parolee's eventual victims, because its negligent actions were discretionary, or because its negligence could not have caused the murders. We reach no conclusions as to the reasonableness in fact of the state's treatment or supervision of Nukapigak. We hold, however, that the state had a duty to supervise him carefully, that this duty extended to anyone foreseeably endangered by him, and that the sovereign immunity statute will not shield the state from the consequences of its breach of that duty. We conclude that Neakok has submitted enough evidence of the state's negligence, and of the foreseeability and preventability of Nukapigak's actions to merit denial of the state's summary judgment motion. Accordingly, except insofar as it subjects the state to liability for its negligence in treating Nukapigak in

**21.** Neither the intentional character of Nukapigak's acts nor their culpability can relieve the state of liability where, as here, the state owed a duty of due care to prevent Nukapigak's intentional, culpable acts. *See Decker v. Gibson Products Co. of Albany*, 679 F.2d 212 (11th Cir. 1982).

**22.** In *Morris*, we held that a liquor store that sold alcohol to a minor could be held liable for deaths caused by an ensuing automobile accident, despite the wrongfulness of the minor's conduct in purchasing the liquor and sharing it with the driver of a car.

The state also argues that its actions were not "so important in bringing about the injury that reasonable men would regard [them] as a cause." It contends that Nukapigak's actions were so much more important as causes of the injury that the state's alleged negligence must be seen as, at most, an attenuated cause of the murders. Again, if the state was negligent at all, it was negligent in failing to use due care to prevent circumstances which would make Nukapigak likely to be violent. Nukapigak's violent acts cannot therefore be viewed as a cause of the injuries independent of the state's negligence.

prison, and subjects the Alaska Parole Board to liability, we affirm the judgment of the superior court.

AFFIRMED in part, REVERSED in part, and REMANDED.

MOORE, J., not participating.

MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, dissenting.

In my view, the state is not subject to liability in tort for failing to impose conditions of parole, either at the parole board or the parole officer level. Such decisions are akin to decisions which a sentencing judge must make in deciding on the terms of a sentence of probation and are plainly discretionary.[1] The fact that such decisions may be made by parole officers does not make them different in the degree or type of discretion involved from those made by the parole board.[2]

With respect to the question of whether a parole officer, and the state, may be liable for negligently supervising a parolee, I believe that there may be liability should a parole officer fail to respond appropriately upon receiving notice of a parole violation having potentially serious implications.[3] I would not take the next step and hold that there can be liability for an alleged failure to seek out parole violations. Such a ruling would interfere with decisions which are necessarily discretionary, involving a balancing of the sometimes competing goals of obtaining the maximum degree of rehabilitation while avoiding unnecessary interference with the parolee, protecting the public, and maximizing the effective allocation of available resources.

Concerning the failure to warn claim, in my view the state was entitled to summary judgment that as a matter of law there was no duty to warn. The only events from which one might conclude that Nukapigak was dangerous occurred before he was imprisoned. His wife, his step-daughter, and the inhabitants of Point Lay in general knew of these acts. Nukapigak did not develop any mental illness in jail nor did he make any threats while he was there. The state knew nothing significant about Nukapigak that was not generally appreciated in Point Lay.

Imposing a duty to warn is appropriate only where there is superior knowledge. Thus the California Supreme Court in the leading case of *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 27, 551 P.2d 334, 347 (1976) stressed the danger that might result from "a concealed knowledge of the therapist that his patient was lethal." The requirement of superior knowledge is consistent with the duty to warn as it exists generally in the law of torts. A manufacturer need only warn of substantial hazards inherent in his product which are not readily recognized by the ordinary consumer, *Prince v. Parachutes, Inc.,* 685 P.2d 83 (Alaska 1984) and the owner of land need not warn of obvious dangers, W. Prosser, *Handbook of the Law of Torts* § 61 at 394 (4th ed. 1971). Since the state did not have superior knowledge of Nukapigak's dangerous propensities no duty to warn arose.

With respect to the claim that the state should be liable for failing to provide Nukapigak effective therapy in jail, I agree with the majority's conclusion that reversal is warranted. In plaintiffs' statement of genuine issues submitted in opposition to the state's motion for summary judgment, no

---

1. Cf. *State v. Chaney,* 477 P.2d 441, 443–44 (Alaska 1970) (sentencing is a discretionary judicial function which involves the judicious balancing of the many and ofttimes competing factors encompassed within the constitutional touchstones of reformation and protection of the public).

2. "[I]t is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case." *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660, 674 (1984). *See also Earthmovers of Fairbanks, Inc. v. State,* 691 P.2d 281 (Alaska 1984) (police officer's decision to reduce speed limit is discretionary).

3. *See City of Kotzebue v. McLean,* 702 P.2d 1309 (Alaska 1985) (police officer has duty to respond upon receiving notice of a life-threatening situation).

such contention was raised. Thus, the state was entitled to summary judgment on the counts relating to this claim.

For these reasons I would reverse the decision of the superior court and remand this case with directions to enter judgment for the state.