**Lisa LIVINGSTON, Plaintiff,**

v.

**Donald GRIBETZ, Defendant.**

**No. 81 Civ. 5201(MP).**

United States District Court, S.D. New York.

Oct. 7, 1982.

Baker, Garber, Duffy & Baker, Hoboken, N.J., for plaintiff by Gerald H. Baker, Hoboken, N.J.

Heidell, Pittoni & Moran, New York City, for defendant by Robert C. Heidell, New York City.

## DECISION

MILTON POLLACK, District Judge.

THE COURT: At the close of the plaintiff's case and again at the close of the entire case, defendant moves for a dismissal of the complaint for failure to make out a prima facie case, or in the alternative for a directed verdict for defendant. For the reasons shown hereafter a verdict will be directed in defendant's favor.

This case was tried to the Court and a jury. The jurisdiction is predicated on diversity of citizenship. The action is allegedly one in negligence. This is not a malpractice suit.

On February 26, 1979, plaintiff Nurse Livingston was a registered professional nurse licensed by the State of New York after examination, employed by the Mount Sinai Medical Center, and assigned to the postpartum obstetrical unit. Having previ-

ously been awarded a baccalaureate degree from the New School of Social Science and a Bachelor of Science degree of Lehman College, Nurse Livingston became employed by the hospital.

At approximately 8:00 a.m. on February 26, while on duty at the medical center, Nurse Livingston was undressing a four-day old baby boy in order to demonstrate bathing techniques to his mother. After having undressed the infant for the purpose of a bathing demonstration, Nurse Livingston observed a flat red blister-like lesion, which she described as slightly larger than a dime, on the boy's neck. She said she had never seen herpes before except in magazines which she had read, but she suspected that this was herpes.

She immediately reported the lesion to her supervisor, the charge nurse, Eva Blumstein, who came in, saw the child, and instructed Nurse Livingston to remove the baby from the nursery to the private room in which the mother was located.

The charge nurse then telephoned Dr. Donald Gribetz, the defendant and the infant's attending pediatrician, and told him about the child, advised him that the child was being or had been transferred to a private room in which the mother was located, and the doctor confirmed the removal of the child from the nursery and arranged to visit the child promptly and see for himself what was going on.

Meanwhile, Nurse Livingston, in handling the child's diaper and T-shirt, had noticed other lesions on baby's groin and penis.

Dr. Gribetz arrived at the private room at approximately 10:30 that morning and examined his patient, the infant. The pediatrician was in doubt of the nature of the ailment. It could have been one of a few things, some non-infectious, but he suspected it might be herpes, and to make a diagnosis he immediately ordered that a culture of the lesion be taken and that the infant be kept with his mother in the latter's room.

At this time Nurse Livingston was fully aware that she had observed a suspicious lesion. Indeed, she referred to it as ugly, or some other characteristic of a contagious herpes virus.

She claims that she asked the doctor what to do about wearing gloves and gowns and was told that the essential for her was strict hand washing, and gloves and gowns were not essential.

This is disputed by the doctor who denies any such conversation and claims that he expected the nursing staff to follow the hospital protocol and ordinary nursing intelligence and training since the nursing function was up to the nursing staff.

The plaintiff testified that she respected the doctor's judgment because of his experience and didn't use gloves that first day, February 26.

A witness in the isolated room, the mother of the child, has contradicted the testimony and testified that Nurse Livingston was wearing gloves on February 26.

Be that as it may, Nurse Livingston adds that she volunteered to continue to provide nursing care for both the infant and his mother, and that she undertook to arrange for a nurse's aide to care of the other babies who were on the floor and who would otherwise have been Nurse Livingston's responsibility for that day.

Nurse Livingston testified that she continued to use the same gown that she had had on February 26, all that day as well as on the next day while in and out of the mother's private room, and in washing her hands she would roll up her sleeves, the sleeves on a long-sleeved gown, and then roll them down again.

On the following morning, February 27, Nurse Livingston continued to provide nursing service for both the mother and the infant in the isolation of the mother's room. The infant showed no signs of illness and continued to eat well, and she so reported to the doctor upon his normal routine inquiries when visiting the child.

Later on this same day the laboratory reported that the cultures taken of the baby were positive for herpes. The doctor was so notified.

Following the lab report and further examination of the child and considering the diagnosis made, Dr. Gribetz consulted with the head of the Department of Pediatrics and thereafter ordered his patient transferred to the pediatric intensive care unit for treatment of herpes. No special instructions were given to the nursing staff in the intensive care unit.

The transfer of the child was completed by the hospital staff. Nurse Livingston did not follow the infant into the intensive care unit.

There have been presented manuals of Mount Sinai Hospital relating to infectious disease observed in the hospital and the procedures and precautions to be taken. Exhibit 2, the Mount Sinai infection control manual, specifies that in cases of strict isolation—and plaintiff's counsel has identified the particular condition considered to apply here, namely a condition deemed hazardous by the physician in charge to other patients, personnel, and visitors—the following procedures are to be followed:

First, the patient is to be placed in a room with hand washing facilities alone, or with other patients having the same condition.

The patient was placed in such a room.

"2. All items in the room or coming out of the room are considered contaminated.

"3. All personnel and visitors must wear gowns and masks."

The head of the Pediatrics Department has testified that even these infection control procedures were by the Pediatrics Department as a matter of practice supplemented by the protocol that nurses use gloves.

The transfer of the child was completed by the hospital staff, as I have said.

On the following day, or that evening of the transfer, Nurse Livingston became aware of an itching and burning sensation near her own right eyelid or brow sometime in the evening.

She reported this and was told to present herself to Dermatology, which she did the next day, and the physician there ordered a culture.

This was subsequently reported as positive for herpes simplex.

On March 5, 1979, Nurse Livingston was admitted to Mount Sinai Hospital as a patient complaining of headache, fever and nausea.

Following a presumptive diagnosis of herpes simplex encephalitis, she was treated with a medication known as Ara-A.

By March 13, 1979, she had recovered sufficiently to be discharged from the hospital.

The testimony shows that subsequently she went to work for several hospitals in the obstetrical departments, such as Roosevelt Hospital, and later on two or three others in California, and is presently a nurse in a California hospital, again in the obstetrical area.

Plaintiff contends in this case that she contracted viral herpes encephalitis secondary to herpes simplex in the course of her contact with this infant.

She has brought suit against Dr. Donald Gribetz, the infant's treating pediatrician, sounding in common law negligence on the theory that Dr. Gribetz failed to either institute or to monitor proper isolation procedures for the child and his nurse and that the doctor's alleged omissions proximately caused the plaintiff nurse to contract a viral infection with resultant permanent injuries.

Initially it must be recognized that the plaintiff does not claim to have been a patient of Dr. Gribetz. She was a professional registered nurse and a licensed nurse employed by a hospital, Mount Sinai Hospital, and assigned to the nursery ward or unit.

There is no claim herein against the hospital. One apparently was initially asserted, according to the record of this case, but then voluntarily dropped.

Plaintiff contends herein that Dr. Gribetz

(1) failed to institute proper isolation procedures

(2) improperly relied upon the nursing staff to establish isolation procedures for nursing personnel without giving specific instructions as to the use of gowns, gloves and masks

(3) improperly relied on nursing protocol in the hospital without being familiar with the details of that protocol and without having specific knowledge of the details of the isolation procedures to be followed by the nursing personnel under that protocol

(4) improperly advised the plaintiff that gowns, gloves, and masks were not necessary but that strict handwashing would be sufficient

(5) failed to determine whether nursing personnel were following proper isolation procedures, failed to properly instruct those nurses; failed to monitor those nurses, and failed to make sure that those procedures were being followed.

The plaintiff's principal expert in this case, a former employee of the Control Center for Communicable Disease in Atlanta who currently is located in Honolulu, Hawaii, as a teacher and possibly connected with an institution, health institution out there, testified that it was speculation as to when Nurse Livingston actually contracted the herpes simplex virus, that the infection's onset depended on when the nurse touched her face during the two days involved, and whether the virus was on her hand or on a contaminated glove or some other contaminated fomite.

He said that he couldn't say that the gloves employed on February 27th were not contaminated, nor could he say that the gown, which the nurse said she wore for at least two days, even while she was in the private room, was not contaminated fomite, but he did say nonetheless that in his opinion the use of gloves was mandatory in a case involving herpes and that strict handwashing was an insufficient precaution.

■ In negligence cases the duty is always the same: to conform to reasonable conduct in the light of the apparent risk.

The legal standard relates to conduct not consequences.

■ The question whether there is a duty boils down to whether the plaintiff's interests are entitled to legal protection against the defendant's alleged conduct or alleged omissions.

■ A defendant who is under no duty to a plaintiff is not liable, even if negligent.

■ For negligence liability, in addition to a duty owing to the plaintiff, is a breach of that duty, a failure of the defendant to conform to an obligatory standard; there must be a reasonably close causal connection between the conduct and the resulting injury, commonly known as "legal cause" or "proximate cause."

■ The omission of a customary procedure or even a suggested guideline promulgated by health organizations or those interested in the subject matter and recommended as procedures and published as such for the consideration of a hospital, its medical staff and its nurses, is not to be equated with negligence or considered to have implicated as negligent any omission from any such recommended procedures.

Indeed, as we have seen, the Infection Control Manual of the particular hospital, the Mount Sinai Medical Center, was prepared by its Committee on Control of Infections and reads in relevant part that any condition deemed hazardous according to the New York City Health Code, 11.57, by the physician in charge to other patients, personnel and visitors should be dealt with procedurally, as I have already indicated; namely, to place the patient in a separate room that has handwashing facilities, alone or with other patients having the same condition; that all items in the room or coming out of the room should be considered contaminated, and that all personnel and visitors must wear gowns and masks.

As we have heard, Mount Sinai supplemented the use of gloves, but the plaintiff's expert acknowledged that it was perfectly silly to suggest masks in a contact situation involving herpes, since the infection is not airborne transmitted.

In all events, those are the only conditions and procedures of "Strict Isolation" prescribed by the Mount Sinai manual.

The plaintiff has proffered here the Health Code of the State of New York and its rules and regulations pertaining to medical facilities and what they should provide. N.Y.Admin.Code T. 10 § 405.8

Bear in mind, this is medical facilities that he has called attention to, not doctors therein.

Those provisions may appropriately be called to attention. The first of these is that an infant shall be placed promptly in an observation nursery under the following circumstances, that is, when the infant is suspected of but not diagnosed as having diarrhea or some communicable condition.

The term "observation nursery" shall mean a room, physically separate from the well-infant nursery, where infants exposed to potential sources of infection and infants suspected of but not diagnosed as having diarrhea or any communicable condition may be observed pending diagnosis.

And then, of course, after the diagnosis, the infant is placed in the isolation nursery and not returned to the well-infant nursery.

And, finally, the definition by the State of the term "Isolation Nursery" means a room not located within the maternity and newborn services for the isolation of infants diagnosed as having diarrhea or any communicable diseases.

Those are the state regulations which apparently in all respects, according to the undisputed evidence, were conformed with by the hospital in this case.

Returning to the pediatrician, a pediatrician may reasonably and legally leave to hospital attendants routine methods of performing their duties, with the reasonable expectation that hospital servants will follow hospital protocol as the obligation of that professional staff.

Nurse Livingston, a licensed professional, was under no restraint, according to the proof, when herpes was suspected, with respect to whether she could don gloves, gowns or masks, whether or not required by protocol or whether or not in the judgment of Dr. Gribetz they could be omitted; they were available at her request.

Parenthetically, as we have heard this morning, the mother of the child has testified that the nurse did in fact don gloves and gown on February 26th by noontime, while in the mother's private room, to which the baby had been moved from the nursery.

This flatly contradicted the testimony of Nurse Livingston, but the contradiction need not be resolved for purposes of this motion going as it does to an issue of plaintiff's credibility who testified in all events that she was prepared to and did follow the alleged judgment on gloves of Dr. Gribetz in the light of his experience and standing.

■ An act or omission is not regarded as a cause of an event if the particular event would have occurred without it.

Here the donning of any of the foregoing paraphernalia or the hospital location of the infant were no guarantees that the particular event, namely, contact with herpes and infection therefrom, would not have occurred or been prevented had Nurse Livingston used any or all of that paraphernalia, gowns, masks, or gloves, or the infant sent to the intensive care unit.

The event which occurred, that is, the contraction of herpes simplex by the nurse could have occurred either before or after she transferred the baby to the mother's private room, before Dr. Gribetz ever heard of the problem that the nurse observed, and regardless of whether the patient Baby S was immediately suspected of herpes infection and therefore moved to strict isolation or whether moved thereto only after a diagnosis of herpes was actually made as a result of a culture report, and the contraction of the herpes simplex by the nurse in the light of all the facts and circumstances adduced here could have occurred whether the baby was moved to stricter isolation only after a diagnosis of herpes was actually made following the culture report, and whether or not she claims she was or was not told that in the doctor's judgment no

244

gloves or gowns were needed, and that only strict handwashing was essential, during the period of suspicion. According to the plaintiff's expert, fomite materials used by the nurse after the diagnosis, may well have been the contaminated agents from which she contracted and transmitted the infection to her face.

■ In the circumstances, Dr. Gribetz did not owe a duty to this registered nurse to refrain from expressing to the nurse (an expression he denies) that in his judgment strict handwashing was more effective prophylactically and the appropriate procedure for her to follow during the investigation of the suspicion of herpes and before a culture furnished a basis for diagnosis of herpes; or to instruct her in nursing protocol and to monitor her nursing performance.

The hospital manual on which plaintiff places her reliance did not even require gloves for strict isolation of such a case as this; it speaks only of gowns and masks and as to the latter we have seen that masks have no relevance to a contact infection.

There is here no real evidence of a duty or breach of duty by the defendant owing to the plaintiff.

The appropriate steps with respect to the doctor's patient are not questioned. There is no claim here by the patient of any impropriety. The culture was ordered promptly. The condition was susceptible of having been noninfectious so far as appearances go.

The child was isolated to a private room from others in the nursery even before the doctor was called. Strict isolation in accordance with the Mount Sinai Hospital procedures followed soon after in the medical judgment of the doctors, the diagnosis could be made of herpes infection and the general condition of the child properly appraised.

The guidelines suggested there by the Department of Health, Education and Welfare were not obligatory on Mount Sinai or its doctors as was conceded here. Indeed, HEW's pamphlet expressly notes that it expected "disagreement with some of the suggestions...." "since there are gaps in the knowledge of the epidemiology of some infections."

The pamphlet openly states that "hospitals are encouraged to modify or supplement this manual to meet their own needs."

There was no violation on the part of the hospital or of Dr. Gribetz of any obligatory or other "standard" method of procedure in such cases.

No competent knowledgeable evidence was adduced from any source to the contrary.

Conclusory opinions on Mount Sinai Hospital's procedures to the contrary carry no weight considering their source and absence of authoritative statement thereof.

In all events, the hospital is not here on trial.

But most significant of all, even if all the other elements of the negligence claims had fallen into place by competent proof, the essential element of proximate cause is wholly absent. That is supplied only by speculation, by a mere possibility of such proximate causation, and that is not enough.

Liability may not be predicated as here on pure speculation which lies at the bottom of this lawsuit. As plaintiff's own expert, Dr. Morens of Honolulu conceded in his testimony no proximate cause was established.

There was no proof that the room placement, the use of gloves or the donning of masks or gowns would have kept the nurse free of risks of the illness she contracted, seemingly caused by brushing her face or brow or eyelid area with her hand or contaminated gloves.

The probabilities are equally cogent that none of the alleged omissions had anything at all to do with the transmission that actually occurred when it occurred.

No one was able to say when actually the infection of the nurse occurred. It could have been before the doctor was called, it could have been after the nurse admittedly claims that she donned gloves.

A mere possibility, a speculation, that the absence of strict isolation, the absence of gloves or sterile gowns as causative factors of the actual infection at the time when it occurred, remain as pure speculation or conjecture; and even if the probabilities were to be regarded as evenly balanced, it nevertheless becomes the duty of the Court in the interests of justice and fairness to direct a verdict for the defendant.

In *Smith v. Wisch,* 77 A.D.2d 619, 430 N.Y.S.2d 115, a useful quote appears:

"The circumstances of [the accident] imply the absence of any causative defect as clearly as they imply its presence and therefore would subject a jury to speculative evaluation of the merits of the action. Where a jury would be compelled to speculate upon various possible causes of an accident which may be as reasonably attributed to a condition for which no liability attaches as to the one for which it does, then the plaintiff is not entitled to recover, and the evidence should not be submitted to the jury.'"

*Haldeman v. Bell Tel. Co.,* 387 F.2d 557, 559 (3d Cir. 1967); *Almond v. Pollon,* 198 F.Supp. 301 (E.D.Pa.1961); aff'd per curiam 300 F.2d 763 (3d Cir. 1961).

Accordingly, the defendant is entitled to and the Court hereby directs a verdict of the jury in favor of the defendant and against the plaintiff, thereby dismissing the complaint.

On the law there is no basis on which the plaintiff may recover herein.

Complaint dismissed on the directed verdict, with costs.

So ordered.