Walter **BOLIEU** and Orlin
Oliver, Appellants,

v.

**SISTERS OF PROVIDENCE IN WASH-
INGTON, and/or d/b/a Our Lady of
Compassion Care Center,** Appellee.

No. S–7575.

Supreme Court of Alaska.

Feb. 13, 1998.

Charles W. Coe, Anchorage, for Appellants.

John M. Conway and Anne E. Kane, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

EASTAUGH, Justice.

I. *INTRODUCTION*

The issue presented is whether a residential health care facility owes to the spouses of the facility's nursing assistants any duty of care to control infections or warn of the danger of infection. The superior court held that it does not. Because we conclude that the relevant considerations warrant imposing a duty of care, we reverse.

II. *FACTS AND PROCEEDINGS*

Gwen Bolieu and Bodhmati Oliver were employed as nursing assistants at Our Lady of Compassion Care Center (Our Lady).[1] They are respectively married to Walter Bolieu and Orlin Oliver. Sisters of Providence in Washington operates Our Lady, a convalescent and long-term residential care facility. Among other things, nursing assistants take the blood pressure of Our Lady residents and help them bathe.

In 1990 several Our Lady employees reported skin problems. They complained of a skin rash with itchy bumps. The Director of Quality Management at Our Lady, Nurse Kathleen Lum, sent the employees, including

---

1. Many of the circumstances discussed in Part II were first asserted when plaintiffs moved for reconsideration after summary judgment was entered against them; we assume for purposes of discussion that no genuine dispute about those facts is material to the narrow legal issue before us. We rely on these assertions only to set the stage for our discussion of the legal issue; they are not dispositive of that issue.

Bodhmati, to a treatment center where Bodhmati was diagnosed with a staph infection.[2] She was off work for a week and treated with antibiotics. Gwen also contracted a skin rash in 1990.

Nurse Lum also directed the nursing staff to check the skin of Our Lady patients. Nurse Lum affied that at least three patients suffered from rashes, but that the cause was not determined. A microscopic examination ruled out scabies.[3]

In 1991 many Our Lady employees again complained of various skin rashes and disorders. Nurse Lum sent them to a dermatologist or a treatment center for examination.

In June 1991 Bodhmati was diagnosed and treated for a staph infection. In July 1991 Gwen was diagnosed and treated for a staph infection.

Gwen and Bodhmati filed workers' compensation claims. Dr. Michael Beirne apparently concluded in the context of their workers' compensation claims that their infections were work-related. Dr. Beirne later explained in a deposition taken in the tort suits that

> [T]hey would have the—the condition when they were at work, and then when they retreated them and kept them off work for a while, they—the condition would resolve. And then when they would go back on the job, the disease would recur.
>
> And this happened a number of times, and we came to the conclusion that that was—that was the situation, that they were picking it up at work and that environment, or whatever was there, however it worked, was causing this.

Infectious disease specialists—including Drs. Burton Janis and Paul Roberts, who evaluated Gwen and Bodhmati in the workers' compensation proceedings—offered opinions contrary to Dr. Beirne's, concluding that the employees' skin conditions were not work-related. Their opinions seem to be founded on the widespread distribution of staph bacteria in the general community.

Dr. Beirne diagnosed both Walter Bolieu and Orlin Oliver with staphylococcus bacterial infections. He opined that they contracted their skin infections from their wives.

Walter and Orlin each filed a personal injury complaint against Our Lady in 1993; each alleged that he had been infected with staph during visits to the facility and/or through contact with his wife. Their complaints asserted that Our Lady owed them and their families "a duty of care to maintain their care center free of staph or other infections [sic] diseases." The cases were consolidated.

Our Lady moved for summary judgment, arguing in part that health care facilities have no duty to protect non-patients from infectious agents routinely encountered in the general community.[4] The superior court granted Our Lady's motion. Applying the factors set out in *D.S.W. v. Fairbanks North Star Borough School District*, 628 P.2d 554, 555 (Alaska 1981), it ruled that Our Lady owed Walter and Orlin no duty of care.

Walter and Orlin filed a motion for reconsideration, supported by extensive materials not previously filed. The superior court denied their motion, entered final judgment against them, and awarded attorney's fees and costs to Our Lady.

2.  A staph infection is caused by staphylococci, a common type of bacteria. These bacteria are one of the leading causes of skin and soft tissue infections in the community and in a hospital setting. The bacteria invade through minor breaks in skin and mucous membranes and often create abscesses with creamy, yellow pus. Medical tests can readily identify these bacteria. The prognosis for most staph infections is excellent.

3.  Scabies is a skin disease caused by infestation with mites. It is transmitted in hospitals primarily through intimate direct contact with an infest-

ed person. Treatment for scabies is highly effective in preventing transmission and destroying the mites.

4.  Our Lady also argued that (1) the exclusive liability provision of the Alaska Workers' Compensation Act barred the spouses' claims, and (2) there was no causal connection between the spouses' injuries and the work environment at Our Lady. The superior court denied the motion on the exclusive liability issue. It did not rule on the causation argument.

Walter and Orlin argue on appeal that Our Lady owes them a duty of care.

## III. *DISCUSSION*

### A. *Standard of Review*

We review "a grant of summary judgment *de novo* and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1134 (Alaska 1996) (citations omitted). We will uphold a grant of summary judgment if the record presents no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Newton v. Magill*, 872 P.2d 1213, 1215 (Alaska 1994). Because the duty issue was presented to the superior court on Our Lady's motion for summary judgment, we take all permissible factual inferences in favor of Walter and Orlin.

■ "The existence and extent of a duty of care are questions of law for the court to determine." *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992) (applying the test established in *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038, 1040–43 (Alaska 1986), to allow plaintiff to pursue claim for negligent infliction of emotional distress).

### B. *Does Our Lady's Duty to Minimize Infection or Warn Employees Extend to Nursing Assistants' Spouses?*

Walter and Orlin claim that Our Lady owed them a duty to take "reasonable measures" to control infectious diseases at its facility. They also argue that Our Lady owed them a duty to inform or warn employees that their infections could be spread to family members, and that the employees should take measures to prevent such a spread. The superior court concluded that Our Lady owed the spouses no duty of care.

Before a defendant can be held liable for negligence, it must owe a duty of care to the plaintiff. *See Division of Corrections v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986). "Duty" is the "expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." *Id.* (quoting William L. Prosser, *The Law of Torts* § 53, at 325–26 (4th ed.1971)). In the absence of any other source of a duty of care (imposed, for example, by statute, contract, or doctrine of law) we consider seven factors in deciding whether a duty of care exists:

> "The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*D.S.W.*, 628 P.2d at 555 (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal. App.3d 814, 131 Cal.Rptr. 854, 859–60 (1976)).[5]

We weigh these *"D.S.W. factors"* to determine whether a duty of care exists. *See Estate of Day v. Willis*, 897 P.2d 78, 81–82 (Alaska 1995) (after balancing the *D.S.W.* factors, holding officers owed no duty to protect fleeing offenders from their own actions). In analyzing the factors, we treat the legal relationship between individuals as the focus for the duty question. *See* W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 53, at 356 (5th ed. 1984) [hereinafter Keeton] ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a

---

5. We applied equivalent factors in cases decided before *D.S.W. See Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492, 495 (Alaska 1973) (identifying four of the seven *D.S.W.* factors); *Howarth v. Pfeifer*, 443 P.2d 39, 42 (Alaska 1968) (identifying four of the seven *D.S.W.* factors). *Howarth* relied on two California Supreme Court opinions concerning improperly prepared wills; in both, the California Supreme Court found a duty of care in the absence of privity. *Howarth*, 443 P.2d at 42 n. 6 (citing *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961); *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958)).

legal standard of what is required to meet the obligation.").[6]

### 1. *Foreseeability of the harm*

We have stated that "[t]he most important single criterion for imposing a duty of care is foreseeability." *Neakok,* 721 P.2d at 1125 (citing *Tarasoff v. Regents of the Univ. of Calif.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976)); *see also Karen L. v. State, Dep't of Health & Soc. Svcs.,* 953 P.2d 871 (Alaska 1998); *R.E. v. State,* 878 P.2d 1341, 1346 (Alaska 1994).

Walter and Orlin argue that the harm to them was foreseeable because Our Lady lacked effective infection control, ventilation, and sanitation. They argue that spouses of Our Lady employees are an identifiable group of people foreseeably affected by the facility's environment. Our Lady agrees that it is foreseeable that patients, employees, and visitors will be exposed to infectious agents at health care facilities, but asserts that "it is equally foreseeable" they will be exposed to the same agents elsewhere, and that the exposure is an inherent risk of human contact.

It is undisputed that patients at Our Lady occasionally contract infectious diseases. If the facility fails to take reasonable measures to control the spread of infectious disease at the facility, it is foreseeable that some employees will contract diseases from patients. It is also foreseeable that employees who contract infectious diseases at work might transmit those diseases to their spouses.

In a comparable case, the spouse of a hospital security guard exposed to the AIDS virus sued the hospital on a claim of negligent infliction of emotional distress. *See Vallery v. Southern Baptist Hosp.,* 630 So.2d 861, 862–63, 868, 869 (La.App.1993) (holding, in part, that the hospital owed the spouse a duty of care). Foreseeability is a component of Louisiana's test to determine whether a duty exists. *Id.* at 868. The court held that "[i]t is highly foreseeable that a security guard negligently exposed to HIV will be married and will have unprotected sexual relations with his wife unless promptly warned of his HIV exposure." *Id.; see also Jarvis v. Providence Hosp.,* 178 Mich.App. 586, 444 N.W.2d 236, 240 (1989) (finding a duty owed to a hospital lab technician's fetus, and holding that it was foreseeable that technician might contract hepatitis if not promptly given gamma globulin injection after cutting her finger on a vial, and that "[s]ince Mrs. Jarvis was then pregnant, a fact known to defendant, it was also foreseeable that, should Mrs. Jarvis contract hepatitis, the fetus might suffer injury as well"); *Wojcik v. Aluminum Co. of America,* 18 Misc.2d 740, 183 N.Y.S.2d 351, 357–58 (N.Y.Sup.1959) ("The risk of the plaintiff-wife contracting tuberculosis from her [employee] husband, when unaware that he was so afflicted, was reasonably foreseeable by the defendant [employer].").[7]

---

6. The parties argue about whether Our Lady failed to minimize the spread of infectious disease and about the extent to which patients and employees were infected. Our Lady also argues that infections such as staph are everywhere. To the extent such arguments relate to issues of breach of duty and causation, they are not before us. *See* Keeton, *supra,* § 53, at 356 ("What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty."). To the extent Our Lady argues that staph is so universal that, as a matter of law, Our Lady owed no duty to Walter and Orlin, we consider its argument in our analysis of the duty issue.

We note that Our Lady does not argue that it owed no duty to its employees and patients to minimize the spread of infectious disease. Our Lady instead states that "our ... infection control policies are designed 'to protect [facility] residents and employees from the spread of infection.' "

7. Courts have noted the foreseeability of the spread of infections from patients to family members if doctors or hospitals negligently fail to diagnose a disease or warn the patient of its infectious nature. *See, e.g., Shepard v. Redford Community Hosp.,* 151 Mich.App. 242, 390 N.W.2d 239, 241 (1986) (concluding that patient's son was foreseeable victim of hospital's negligence in failing to diagnose patient's spinal meningitis); *Skillings v. Allen,* 143 Minn. 323, 173 N.W. 663, 664 (1919) (concluding that it was foreseeable that patient's parents would rely on doctor's advice concerning the contagious nature of scarlet fever); *see also DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422, 424–25 (1990) (concluding that it was foreseeable that third person would rely on information given to patient by doctor concerning the contagious nature of hepatitis). It is also foreseeable that employees will infect spouses if the employer-hospital fails to control the spread of

We conclude that it was foreseeable that spouses of Our Lady nursing assistants could be infected by diseases if Our Lady did not take reasonable measures at the facility to minimize the spread of those diseases to the nursing assistants and their spouses, or did not warn the nursing assistants to take precautions to avoid infecting their spouses.

2. *The degree of certainty that plaintiffs suffered injury and the closeness of the connection between their infections and the actions of Our Lady*

Walter and Orlin allege that their staph infections were a result of Our Lady's disregard for sanitary, health, and infection control practices.

Our Lady disagrees with the spouses' argument that links the environment at Our Lady with the spouses' infections.[8] Our Lady discounts assertions of poor infection control by stating that Our Lady had established infection control procedures.

Determining whether these plaintiffs were infected is not inherently so difficult that it militates against imposing a duty. Likewise, any genuine disputes about whether they were infected and what disease infected them do not bear on the legal issue now before us, but on issues of breach of duty, causation, and damages.

We also conclude that the manner in which plaintiffs allegedly became infected is connected closely enough to Our Lady's alleged omissions to support imposing a duty. The alleged connection between Our Lady's conduct and the type of harm plaintiffs claim to have suffered is not remote. There is potentially a direct relationship between the facility's conduct and an infection transmitted to the spouse by direct exposure when the spouse visits the employee at the facility, or

by indirect exposure when the spouse has contact with the infected nursing assistant. Plaintiffs allege that at least thirty-eight employees suffered from skin problems between 1990 and 1992, and that spouses of other employees were also infected. They also allege that Our Lady committed many health violations that would contribute to the spread of infection. If proven, these allegations would support an inference that Our Lady's omissions were closely connected to the skin problems suffered by employees and their spouses. Any genuine dispute about whether Our Lady's conduct actually caused injury to Orlin and Walter should be resolved in the context of causation, not duty.

The dissenting opinion argues that the impossibility of establishing with any certainty that Our Lady's conduct caused the spouses to contract this "common" infection militates against finding a duty of care here. Dissent at 1244–1245. It argues that the plaintiffs could have been infected anywhere. Dissent at 1244. We disagree with this analysis. Staph is ubiquitous, but persons with skin or draining staph lesions are highly contagious. "Staphylococcal Infections," *Red Book Report on Committee of Infectious Diseases,* American Academy of Pediatrics 423–26 (1994). The plaintiffs allege health violations by Our Lady that would have increased the risk that employees and patients would be infected by other employees and patients with skin lesions. Employees with skin lesions allegedly were permitted to return to their spouses without receiving any warning from Our Lady concerning the spread of infection. Even if we assume the spouses were also exposed to independent sources of staph bacteria, we cannot ignore the potential additional threat posed by exposure to their infected wives. For purposes of our duty analysis, we must assume that this alleged exposure increased the likelihood the

---

infection or fails to warn employees of the danger of infection.

We also note that it is the majority rule that treating physicians should use reasonable care to protect third persons, in addition to their patients. *See Chizmar v. Mackie,* 896 P.2d 196, 208 (Alaska 1995) (stating with approval the majority rule that physicians must use reasonable care to protect third persons from foreseeable exposure to contagious diseases); *see also Gammill v. United States,* 727 F.2d 950, 954 (10th Cir.1984)

(holding that in contagious disease cases, a "physician may be found liable for failing to warn a patient's family, treating attendants, or other persons likely to be exposed to the patient, of the ... danger of exposure") (emphasis omitted).

8. The parties disagree about the significance of Dr. Beirne's opinion. Given the narrow issues before us, we do not decide whether Dr. Beirne's opinion is a valid expert opinion.

husbands would be infected. Moreover, the number of Our Lady employees and spouses who allegedly suffered skin problems implies a less remote and less uncertain connection between the harm and the conduct than the dissent suggests.

In our view, concerns about whether the plaintiffs were infected by sources unrelated to Our Lady do not militate against imposing a duty of care, but are best addressed when the trial court determines what conduct was required to discharge the duty, and whether any breach of duty caused the plaintiffs' infections.

3. *The moral blame, the policy of preventing future harm, and the extent of the burden to the defendant and consequences to the community of imposing a duty of care*

Walter and Orlin argue that Our Lady's conduct was morally blameworthy because many employees had reported skin rashes. Our Lady denies that there was any "epidemic" or cover-up by Our Lady administration. Our Lady argues that for conduct to be morally blameworthy under *D.S.W.*, it must pose a significant threat of serious physical or emotional harm, hazards it claims were absent here.

There was little or no evidence of moral blameworthiness in the record when the superior court granted summary judgment to Our Lady. Evidence suggesting that many other employees and spouses also suffered skin rashes was first submitted with the plaintiffs' reconsideration motion.

We recognize that staph infections are difficult to contain and normally do not present a threat of serious harm. *See Sommers v. Sisters of Charity of Providence in Oregon*, 277 Or. 549, 561 P.2d 603, 607 (1977) (finding that it is impossible in all cases to prevent the spread of bacteria during insertion of an intravenous needle). We therefore conclude that Our Lady's conduct was not morally blameworthy. We need not decide whether more dangerous infections could justify a conclusion that a facility's conduct was morally blameworthy. *Cf. Neakok*, 721 P.2d at 1129 (state's failure to control violent parolee was "morally blameworthy"); *City of Kotze-*

*bue v. McLean*, 702 P.2d 1309, 1314 (Alaska 1985) (police officer's failure to investigate death threat by a known individual was "morally blameworthy").

Walter and Orlin argue that recognizing a duty of care will not impose a "new or unacceptable burden" on Our Lady because it must follow existing regulations and policies, and must exercise reasonable care in running its facility. They assert that there are known standards and procedures for control of infection. They argue that Our Lady already owes a duty to staff and patients, and that extending the duty to "foreseeable persons in daily physical contact with employees who are also in daily contact with an infected environment" is not unreasonable and will not open the litigation floodgates. The spouses assert that imposing this duty will encourage Our Lady to educate and to warn its employees about the spread of infection.

Our Lady argues that it would be impossible to satisfy a duty of care, because of the difficulty of protecting non-patients and employees from ubiquitous infectious agents. Our Lady asserts that even the most stringent infection control techniques "cannot always prevent infection" by staph.

The superior court noted that imposing a duty in favor of the spouses would not change Our Lady's burden. This conclusion seems correct, because the facility is already required to satisfy high regulatory standards. It consequently appears to us that imposing a duty of care will not require burdensome additional preventative efforts. Further, the facility already owes tort or statutory duties to patients and employees, the persons most directly threatened by inadequate efforts to control infections.

It appears that Our Lady's exposure to great financial burden is small, accepting the analysis of Our Lady and the dissent. On the one hand, the very ubiquity of staph will make it relatively difficult for a plaintiff to establish the causal relationship necessary to recover damages; on the other hand, the relative harmlessness of such infections, Dissent at 1246–1247, means that any damage recovery will be modest. Likewise, the relative harmlessness of such infections means

that facilities will be able to demonstrate that they have discharged the duty of care without taking the sort of measures a more dangerous infection might require. In short, it appears that such claims can be effectively defended on their merits and do not pose a grave economic threat.

Contrary to assertions by Our Lady and the dissent at 1246, we are not imposing some burdensome duty to "protect" persons from disease. Rather, we simply hold that the duty to take reasonable measures to minimize the spread of disease extends to spouses of employees. The degree of care which is reasonable correlates to the severity and the transmissibility of the disease at issue. Concerns about the adequacy of Our Lady's efforts to discharge that duty of care are better resolved when the issue of breach is litigated than when the threshold duty issue is decided.

The burden resulting from imposing a duty to warn or inform also seems legally insignificant, given the relative ease with which it can be discharged. With respect to infections which Our Lady argues are "ubiquitous" and "garden-variety," any duty to inform can be discharged by advising employees of the precautions they should take to avoid becoming infected themselves and to avoid infecting their spouses. A particularized threat about which the facility has superior knowledge may require a more specific warning to employees.

Our Lady argues that imposing a duty will not prevent future harm, because health care facilities are already heavily regulated, and must already comply with the most advanced infection control techniques. The superior court reasoned that imposing a duty would therefore not prevent future harm. Our Lady has not demonstrated that the regulatory standards are directed at preventing the spread of infection to spouses of employees.[9] Our Lady acknowledges that its infection control policies are designed "to protect [facility] residents and employees from the

spread of infection." We are unwilling to assume that imposing a further duty to warn employees about the need for precautions to avoid infecting spouses would have no beneficial effect.

We conclude that these factors support imposing a duty of care because the potential burden of doing so is modest and does not outweigh the potential benefits.

### 4. The availability, cost, and prevalence of insurance

Walter and Orlin assert that Our Lady can insure against these risks, and should bear the cost of doing so. Our Lady argues that it is "highly questionable" whether insurance covering claims of non-patients exposed to "garden-variety infectious agents" is available. It claims that imposing a duty of care would cause health care costs to rise without any meaningful benefit.

We take notice of the circumstance that liability insurance is readily available to cover most personal injury claims alleging breach of a tort duty of care. No evidence in the record supports Our Lady's speculation that such insurance is unavailable, or that its cost would be excessive. If evidence existed to rebut common knowledge about the general availability of liability insurance, we assume that such evidence would have been more readily available to Our Lady than to Walter and Orlin, and would have been offered. Absent such evidence, we assume existing forms of liability insurance cover any additional incremental risk, allowing Our Lady to share that risk with similar facilities and to spread any additional cost of that risk to those who pay for services. For the reasons noted above, the risk of frequent litigation seems small given the difficulty of proving such claims and the modest damages recoverable.

### 5. Other considerations

The dissent would distinguish between cases involving "common infections" and

---

**9.** Information submitted by plaintiffs with their reconsideration motion suggests that at least one public agency elsewhere requires that the families of health care employees be notified if the employees may have been exposed to a serious danger. Marion Gaudinski, an expert on infec- tion control, affied that a county health department in New Jersey has determined that it is the employer's duty to call and warn families of employees exposed to tuberculosis due to the facility's failure to follow regulations.

those involving serious illnesses. Dissent at 1242. We think the duty issue cannot turn on possible distinctions among diseases based on their severity and ubiquity. Whether a hospital negligently fails to minimize an employee's spouse's exposure to staph rather than AIDS should not determine whether the hospital owes the spouse a duty. Rather, the severity and ubiquity of the disease bear on what the facility must do to discharge the duty. Illustrating the distinction between these two inquiries are the two opinions the dissent relies on at 30 to support its argument that no duty should be imposed regarding staph infections. In *Roark v. St. Paul Fire & Marine Insurance Co.*, 415 So.2d 295 (La.App.1982), and *Sommers v. Sisters of Charity of Providence*, 277 Or. 549, 561 P.2d 603 (1977), patients who developed staph infections after invasive procedures sued hospitals for negligence. It is undisputed that doctors owe patients a duty of care. Those cases did not turn on whether a duty existed, but on whether there was evidence the defendants breached that duty. *Roark*, 415 So.2d at 297 (affirming a defense judgment following trial, and stating that "[t]he evidence shows that the procedures employed meet or exceed national standards"); *Sommers*, 561 P.2d at 606 (affirming a defense directed verdict, and stating that "[i]n our view, there was simply no substantial evidence of any negligence on defendant's part presented to the jury"). Both of those cases went to trial; neither court held that the ubiquity of staph bacteria precluded a duty of care.

Also distinguishable are other cases the dissent cites at 27–30 to show that courts have not "recognized a duty owed by health care providers to protect employees' or patients' spouses or other third parties from staph or other common infections." In *Knier v. Albany Medical Center Hospital*, 131 Misc.2d 414, 500 N.Y.S.2d 490 (N.Y.Sup. 1986), a nurse's family contracted scabies after the nurse treated a patient who she did not know had scabies. A trial court declined to impose a duty on the hospital to warn the nurse's family of her exposure to scabies. *Id.* 500 N.Y.S.2d at 491. That court reasoned, and the dissent agrees, that the class of protected people cannot logically be limit-

ed to the nurse's family because "any member of the general public with whom [the nurse] came in contact could share the same risks of infection as plaintiffs." *Id.* at 492; Dissent at 1243. We disagree with that proposition because it fails to recognize that nurses are foreseeably more likely to have intimate contact with family members, especially spouses, than with members of the general public. As the dissent notes, "[scabies] is transmitted ... primarily through *intimate direct contact* with an infested person." Dissent at 1243 n. 7 (emphasis added). Spouses are foreseeably more likely to be at risk than the general public. *See* discussion *supra* Part III.B.1.

In *Troxel v. A.I. duPont Institute*, 431 Pa.Super. 464, 636 A.2d 1179, 1183 (1994), duPont treated Siple, who was infected with cytomegalovirus (CMV), a common disease which is dangerous only if communicated to a pregnant woman. The court declined to extend duPont's duty of care to Troxel, a non-family member who became infected. The *Troxel* court held that duPont's relationship with its patient did not require it to prevent her from infecting third persons. *Id.* We think that conclusion is overbroad, because it fails to recognize the possibility of a duty in favor of those persons, such as spouses, who are foreseeably most at risk.

In *Livingston v. Gribetz*, 549 F.Supp. 238, 244, 245 (S.D.N.Y.1982), the court granted a doctor a directed verdict because there was "no real evidence of a duty or breach of duty" to advise a registered nurse of proper procedures in handling a patient with herpes, and because, "most significant of all," causation was "wholly absent." The court noted that "a pediatrician may reasonably and legally leave to hospital attendants routine methods of performing their duties, with the reasonable expectation that hospital servants will follow hospital protocol as the obligation of that professional staff." *Id.* at 243. The decision, apparently announced from the bench following trial, contains little legal analysis of the duty issue, and rests primarily on the breach and causation issues. *Id.* at 244. (Had there been no duty, there would have been no need to try the case or address the breach and causation issues.) Further,

the court's references to the "registered professional nurse," "registered nurse," "licensed professional," and the "professional staff" imply that the court believed there was no reason to impose a duty in favor of this plaintiff. *See id.* at 239, 241, 243, 244. The doctor was not the nurse's employer, and could expect the nurse to take appropriate precautions to protect herself. In comparison, Our Lady owed an existing duty to nursing assistants to control infection, and we now simply extend that duty to spouses who are foreseeably at risk.

The dissenting opinion states that the result we reach today is "unprecedented and ill-advised." Dissent at 1242. The apparent foundation for that view is the dissent's conclusion that rare or dangerous diseases—which would apparently justify imposing a duty of care to these plaintiffs—must be distinguished from "ubiquitous, relatively harmless infections"—which do not.

One problem with this distinction is that it necessarily makes the legal issue of duty unduly fact specific, turning on the relative ubiquity and severity of the disease. At what point would this fact-specific inquiry justify imposing a duty? What if the disease were found in only ten percent of the adult population? Or six percent? Or if it were very dangerous to limited population groups? We think such fact-intensive inquiries pertain to the issues of breach, causation, and damages, not the threshold legal question of whether a duty exists.

A second problem with this distinction is that the dissent seems to assume that this risk is simply one that everyone bears; it may also assume that the relatively minor consequences of such infections should be borne as a personal risk. The trouble with this assumption is that it ignores the underlying justification for imposing liability: liability assumes that the conduct of the facility has *increased* the risk the general population already bears; it is this incremental additional risk that raises the duty issue. Liability contemplates proof that the spouse was infected as a result of conduct that increased the risk of infection, not as a result of exposure to existing sources of infection. Finally, assuming a facility breaches the applicable standard of care, we see no reason to protect it from the consequences of its negligence. The dissent's legitimate concerns about awarding damages to plaintiffs infected by minor, common diseases are adequately satisfied by requiring a plaintiff to prove that the conduct was negligent, that the negligence was the legal cause of harm, and that the plaintiff suffered damages. The difficulties of surmounting these hurdles provide all the protection the facility legitimately requires. We need not also unduly limit the duty of care to those with whom the facility is in strict privity. If strict privity existed, there would be no reason to consider the *D.S.W.* factors in the first place.

We also note that even a common or relatively benign infection may pose great risk to some members of the population. To find no duty here is to deny those victims any opportunity to make a claim notwithstanding negligent conduct by a facility.

## IV. CONCLUSION

Having weighed the *D.S.W.* factors, we hold that a health care facility owes a duty of care to the spouses of its nursing assistants to take reasonable measures to minimize the spread of infection, including informing its nursing assistants of the risks of exposure. We therefore REVERSE the grant of summary judgment, and REMAND for further proceedings.[10]

FABE, J., with whom BRYNER, J., joins, dissenting.

FABE, Justice, with whom BRYNER, Justice, joins, dissenting.

## I. INTRODUCTION

Because I disagree with the court's conclusion that health care facilities owe a duty of care to their employees' spouses to control the spread of common infections such as staph and to warn of their risks, I dissent from the court's opinion. No other jurisdic-

---

**10.** Given this result, we need not consider the spouses' arguments that the superior court erred in failing to enter separate judgments, in awarding attorney's fees, and in denying their motion for reconsideration.

tion has concluded that health care facilities owe a duty to protect employees' spouses or other third parties from staph or other common infections. Furthermore, the *D.S.W.* factors do not favor imposition of a duty under the circumstances presented here.

## II. *DISCUSSION*

### A. *The Court's Analysis Should Distinguish between Common Infections Such as Staph and Rare or Dangerous Diseases Such as AIDS.*

This case does not require us to pose the question of whether Our Lady owes a duty to protect employees' spouses from infections generally. Rather, it presents the narrower question of whether Our Lady owes a duty to protect employees' spouses from common infections such as staph. The courts that have considered this question have held that a health care provider does not owe such a duty. Because the court's opinion asks the more general question "whether a residential health care facility owes to the spouses of the facility's nursing assistants any duty of care to control infections or warn of the danger of infection," Op. at 1233–1234, it fails to distinguish cases involving rare or dangerous diseases such as AIDS from cases involving ubiquitous, less serious infections such as staph. It therefore misconstrues the duty of a health care provider to protect employees' or patients' spouses or other third parties from harm.

The court's opinion does not rely upon cases addressing the duty owed by a health care provider to protect third parties from common infections. Instead, it finds support in *Vallery v. Southern Baptist Hosp.*, 630

So.2d 861 (La.App.1993), a case involving AIDS. Op. at 1236. In *Vallery*, an AIDS patient bled on the hand of a security guard who did not know the patient had AIDS. *Id.* at 862. Although the hospital was aware the patient had AIDS, the hospital did not inform the guard that he had been exposed to HIV until the following day, after the guard had sexual relations with his wife. The hospital was found to owe a duty to warn the guard's wife of the potential danger. *Id.* at 868–869.

The court's opinion refers to *Vallery* as "comparable" to the case at hand. Op. at 1236. I disagree. The *Vallery* court based its holding in large measure on "policy considerations" not present in this case. Specifically, the court observed that "AIDS is both incurable and fatal" and that simple measures serve to prevent the harm. *Id.* at 868–69. In contrast, as the court's opinion acknowledges elsewhere, staph infections are very common,[1] "are difficult to contain and normally do not present a threat of serious harm."[2] Op. at 1236. The court's failure to recognize the crucial distinction between common infections and serious illnesses leads it to reach what I believe is an unprecedented[3] and ill-advised decision.

Health care providers may owe a duty to protect employees' or patients' spouses or other third parties from rare or dangerous diseases. In the context of an AIDS diagnosis we have observed with approval that "physicians must use reasonable care to protect third persons from foreseeable exposure to contagious diseases." *Chizmar v. Mackie*, 896 P.2d 196, 208 (Alaska 1995). Courts in other jurisdictions have also recognized such a duty in cases where family members are at

---

1. The infectious disease specialists who evaluated Bodhmati Oliver and Gwen Bolieu attested to the ubiquity of staph. Dr. Janis stated that "[u]p to 40% of normal people have staphylococcus aureus in their nose." Dr. Roberts stated that "[n]asal staph carriage will be found in 20–40% of the adult population at any one time, and over a long period of time about 80% of the population will be found to be carriers at one time or another." Their comments are consistent with the medical literature on the subject. *See, e.g.,* "Staphylococcal Infections," *Red Book Report on Committee of Infectious Diseases,* American Academy of Pediatrics 423–26 (1994).

2. *See, e.g., Sommers v. Sisters of Charity of Providence,* 277 Or. 549, 561 P.2d 603, 605 (1977) (noting that it is not always medically possible to eradicate staph bacteria from under the surface of the skin).

3. The court's opinion remarks in a footnote that "at least one public agency elsewhere requires that the families of health care employees be notified if the employees may have been exposed to a serious danger [tuberculosis]." Op. at ——, n. 9. Again, the court's opinion disregards the distinction between a serious danger such as tuberculosis and an infection of a significantly less serious nature such as staph.

risk of contracting AIDS,[4] developing cancer,[5] or falling ill with other potentially fatal diseases.[6]

Courts have not, however, recognized a duty owed by health care providers to protect employees' or patients' spouses or other third parties from staph or other common infections. As one court has reasoned, imposing such a duty "would unduly extend responsibilities and liability of institutions furnishing care to the ill." *Knier v. Albany Med. Ctr. Hosp.*, 131 Misc.2d 414, 500 N.Y.S.2d 490, 492 (N.Y.Sup.1986). In *Knier*, a nurse contracted scabies[7] after contact with a patient with the disease. *Id.* 500 N.Y.S.2d at 491. The hospital did not warn the nurse of the patient's condition. *Id.* The nurse then passed the disease to her two infant children and her boyfriend, who sued the hospital on a negligence theory for failing to follow hospital procedure and failing to warn the nurse of the danger. *Id.* at 491–92. The court held that the hospital owed no duty to plaintiffs. *Id.* at 492. The court reasoned that if it found a duty, there would be no logical reason to limit the class of protected people to the nurse's family, because "any member of the general public with whom [the nurse] came in contact could share the same risks of infection as plaintiffs." *Id.* at 492.

As *Knier* addresses a health care facility's duty to protect employees' family members from a common, relatively harmless infection, it provides persuasive support for affirming

the trial court in the case before us. Indeed, the facts of *Knier* present an even stronger argument than those in this case for imposing a duty on the health care provider. The *Knier* court considered the duty to warn an employee of a danger known to the hospital but not to the employee. In contrast, we consider the duty to warn employees of the danger of infection after the employees had already received treatment for staph. Thus, unlike the *Bolieu* plaintiffs, the *Knier* plaintiffs were faced with a hidden danger. Despite these stronger facts, the court in *Knier* held that the hospital owed no duty to protect the nurse's family members from a common infection.

*Troxel v. A.I. DuPont Inst.*, 431 Pa.Super. 464, 636 A.2d 1179 (1994), also provides compelling support for affirming the trial court. In *Troxel*, the plaintiff contracted cytomegalovirus (CMV), a widespread disease that is "relatively harmless" unless communicated to a pregnant woman who passes it to her unborn child. *Id.* at 1183. Plaintiff, a pregnant woman, contracted the disease after frequent visits with an infected friend who was a patient in the hospital. *Id.* at 1180. Plaintiff's son contracted the disease in utero and died three months after birth. *Id.* The court held that the hospital had no duty to take steps to prevent the patient from coming into contact with other persons. *Id.* at 1183. It reasoned that the

transmission of ubiquitous diseases, such as influenza and CMV, may seriously com-

4. *See Garcia v. Santa Rosa Health Care Corp.*, 925 S.W.2d 372, 377 (Tex.App.1996) (holding health care professionals owed duty to inform patient's wife of patient's probable infection with HIV); *see also Reisner v. Regents of Univ. of Cal.*, 31 Cal.App.4th 1195, 37 Cal.Rptr.2d 518, 519 (1995) (holding that physicians owed duty to patient's boyfriend to warn patient of her HIV status and of dangers associated with the disease, even where physicians did not know boyfriend existed).

5. *See Safer v. Estate of Pack*, 291 N.J.Super. 619, 677 A.2d 1188, 1192 (App.Div.1996) (recognizing "narrow" duty of physician "to warn those known to be at risk of avoidable harm from a genetically transmissible condition" invariably leading to cancer).

6. *See Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn.1993) (recognizing duty of physician to warn patient's wife of risk of exposure to Rocky Mountain Spotted Fever, a non-contagious disease with 40 percent mortality rate if untreated, where clustering effect of disease put family members at risk of contracting it). The California Supreme Court has also recognized the analogous duty of a psychotherapist to use reasonable care to protect an intended victim when a "patient presents a serious danger of violence." *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 20, 551 P.2d 334, 340 (1976).

7. As the court's opinion notes, "[s]cabies is a skin disease caused by infestation with mites. It is transmitted in hospitals primarily through intimate direct contact with an infested person. Treatment for scabies is highly effective in preventing transmission and destroying the mites." Op. at —— n. 3.

promise the health of special classes of persons, such as the elderly or the pregnant, but the treatment of such diseases does not impose liability upon the treating physician or health care provider in the event that the disease is communicated by the patient to a third person.

*Id.* Again, in the case of a common infection, even one with significant health consequences for the particular plaintiff, no duty to third parties was imposed on the health care provider.

Finally, in *Livingston v. Gribetz*, 549 F.Supp. 238 (S.D.N.Y.1982), a nurse allegedly contracted viral herpes from a patient and sued the patient's doctor for negligently failing to advise the nurse of proper procedures to avoid infection. *Id.* at 241. Like *Knier*, *Livingston* presents a stronger argument than the case before us for imposing a duty on the health care provider because the nurse was under the defendant's supervision and in direct contact with the infected patient. Despite the greater foreseeability of danger to the nurse and the stronger causal link between her injury and the defendant's conduct, the court held that the doctor did not owe a duty to advise the nurse how to avoid infection. *See Livingston*, 549 F.Supp. at 244. Taken together, these three cases represent the prevailing view that health care providers do not owe a duty to protect third parties from common infections.

The court's opinion appears even more out of step with the case law from other jurisdictions when considered against the backdrop of cases specifically addressing staph infections. In such cases, courts have consistently refused to find hospitals negligent even when patients, rather than employees' spouses, have developed staph infections. *See, e.g., Roark v. St. Paul Fire & Marine Ins. Co.*, 415 So.2d 295, 299 (La.App.1982); *Sommers v. Sisters of Charity of Providence*, 277 Or. 549, 561 P.2d 603, 607 (1977).[8] Until today's decision, neither this court nor any other has held a health care provider liable to its employees' spouses for common infec-

tions that do not present a threat of serious harm.

B.  *The D.S.W. Factors Do Not Favor Imposition of a Duty under the Circumstances.*

The court's opinion properly identifies *D.S.W. v. Fairbanks North Star Borough School District*, 628 P.2d 554 (Alaska 1981), as providing the analytic framework for determining whether Our Lady owes a duty of care to its employees' spouses. The first *D.S.W.* factor to consider is foreseeability. *Id.* at 555. As Our Lady concedes, it is foreseeable that employees will be exposed to staph and other common infectious agents at health care facilities such as Our Lady. However, as Our Lady points out, "it is equally foreseeable that such persons will be exposed to these same infectious agents at school, on the bus, at the supermarket, or in any other place where people congregate together." In other words, because staph is ubiquitous, it is inevitable that some people will contract it wherever they go, including health care facilities.

While foreseeability may be the single most important *D.S.W.* criterion for imposing a duty of care, it does not necessarily trump the other six. In *Schumacher v. Yakutat*, 946 P.2d 1255 (Alaska 1997), for example, we recently found that three of the *D.S.W.* factors, including foreseeability, militated in favor of imposing a duty. *Id.* at 1257 n. 3. We nevertheless held that "these factors are outweighed by 'the extent of the burden to the defendant and consequences to the community of imposing [such] a duty.'" *Id.* at 1257 (quoting *D.S.W.*, 628 P.2d at 555). Our analysis must then turn to the other six *D.S.W.* factors.

The second and third *D.S.W.* factors are the degree of certainty that the plaintiff suffered injury and the closeness of the connection between the defendant's conduct and the injury suffered. *See D.S.W.*, 628 P.2d at 555. In this case, the relationship between plaintiffs' injury and Our Lady's conduct is nebulous at best. There is simply no way to

---

**8.** Although *Roark* and *Sommers* affirm findings of no negligence and therefore do not address the question of duty, they underscore the difficulties of imposing a duty to protect third parties from staph.

prove one way or the other that the plaintiffs suffered injury because of any conduct on the part of the defendant. As the court's opinion observes, staph is common. Op. at 1234 n. 2. The plaintiffs could have been infected anywhere. Although it may be possible to establish with a degree of certainty that the plaintiffs were in fact injured, it is impossible to establish with any degree of certainty that their injuries were the result of any conduct or omission by Our Lady.

The court's opinion dismisses the second and third *D.S.W.* factors by arguing that they "do not bear on the legal issue now before us [duty], but on issues of breach of duty, causation, and damages" and that they "should be resolved in the context of causation, not duty." Op. at 1237–1238. As the court's opinion itself recognizes, however, duty is the "expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." Op. at 1235. The certainty of a plaintiff's injury and the closeness of the connection between a defendant's conduct and the injury suffered are integral parts of that sum total; indeed, they are included in the *D.S.W.* analysis precisely because they bear on the legal issue of whether a duty exists.

In this case, the implications of finding Our Lady potentially liable for injuries that cannot be traced with any certainty to its conduct suggest that we should not impose a duty. In fact, it was precisely this concern over the absence of a causal connection that informed the analysis in *Roark.* In *Roark,* a patient developed a staph infection after undergoing surgery and sued the hospital. *See Roark* 415 So.2d at 297. In finding that the hospital was not liable, the court observed that it is impossible to trace the origins of

staph bacteria and "[t]herefore, it is not possible to establish the hospital's relationship with, or responsibility for, the subsequent infection." *Id.* at 298–99. Because any connection established between Our Lady's conduct and the staph infections of two of its employees' spouses is similarly speculative,[9] I believe that analysis of the second and third *D.S.W.* factors strongly favors not imposing a duty of care on Our Lady.

The fourth *D.S.W.* factor is the moral blameworthiness of the defendant's conduct. *See D.S.W.,* 628 P.2d at 555. The court's opinion concedes "that Our Lady's conduct was not morally blameworthy." Op. at 1238.

The fifth *D.S.W.* factor is the policy of preventing future harm. *See D.S.W.,* 628 P.2d at 555. The superior court reasoned that imposition of a duty would not prevent future harm. Op. at 1239. I agree. As the court's opinion concedes, health care facilities are "already required to satisfy high regulatory standards" and "already owe[ ] tort or statutory duties to patients and employees, the persons most directly threatened by inadequate efforts to control infections." Op. at 1238. It is therefore unclear what more Our Lady can do to prevent future harm. The court's opinion suggests that Our Lady can discharge its duty to its employees' spouses by advising employees of precautions to avoid infecting themselves and their spouses. Op. at 1239. For staph, such precautions principally involve washing hands thoroughly before and after examining a patient.[10] Thus, it appears that under the court's analysis, Our Lady can discharge its duty to employees' spouses by instructing employees to wash their hands before and after examining patients. Because this is already the standard practice in health care facilities, including Our Lady,[11] it is hard to

---

9. Evidence presented in this case demonstrates the point. While Dr. Beirne speculated at the workers' compensation proceedings that Bodhmati Oliver's and Gwen Bolieu's staph infections were work-related, other infectious disease specialists who evaluated Bodhmati Oliver and Gwen Bolieu disagreed. Op. at ——– ——.

10. *See* John N. Sheagren, *Staphylococcus Aureus: The Persistent Pathogen,* 310 New Eng. J. Med. 1437, 1441 (1984) (stating that "hand washing continues to be the primary way of effectively

preventing the spread of *staph. aureus* "). The Centers for Disease Control and Prevention Guidelines refer to handwashing as "the single most important measure for preventing spread of infection." Draft Guideline for Isolation Precautions in Hospitals, 59 Fed.Reg. 55,551, 55,557 (1994).

11. Our Lady's Universal Moist Body Substances—Isolation, Policy No. 240.057A requires care givers to "[w]ash hands between each patient contact *AND* whenever you accidentally

understand how extension of the existing duty will have any effect on preventing future harm.

The sixth *D.S.W.* factor is the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach.[12] *See D.S.W.* 628 P.2d at 555. The court's opinion concludes that "imposing a duty in favor of the spouses would not change Our Lady's burden." Op. at 1238. I believe there are at least three ways in which the court's opinion creates a potentially onerous burden.

First, as the *Knier* court noted, there is no logical basis for limiting the class of third parties to whom a health care provider such as Our Lady owes a duty of care. *See Knier*, 500 N.Y.S.2d at 492. Employees' spouses are no more likely to contract a common infection such as staph from Our Lady's employees than are other visitors to the facility or other people with whom the employees come in contact. Reason therefore dictates that the duty of care owed by health care providers could extend to protecting a potentially limitless circle of individuals.

Second, as discussed above, the ubiquitous nature of staph makes it impossible to identify the source of an individual's infection. *See Roark*, 415 So.2d at 298–99. Thus, the court's opinion creates the potential that health care providers such as Our Lady may be held liable for any infection contracted by any visitor or employee's family member (or by any third party with whom an employee or patient has contact) that conceivably could have originated in the health care facility. In other words, health care providers may be held liable for common infections that cannot be traced with any degree of certainty to their facilities.

Third, if Our Lady owes a duty to protect employees' spouses from common infections such as staph, there is no reason why it should not owe the same duty to protect them from other widespread, relatively harmless ailments such as influenza or the common cold that, like staph, are impossible to contain. The possibility that a health care provider's duty could be so broadly construed cautions against imposing a duty. In sum, the court's opinion potentially exposes health care providers to liability to a limitless circle of individuals for any number of widespread, relatively harmless ailments that cannot be traced with any certainty to the health care facilities. Because this burden is excessive, I believe analysis of the sixth *D.S.W.* factor militates strongly against imposing a duty of care to protect employees' spouses from common infections.

Finally, the *D.S.W.* analysis requires consideration of the availability, cost and prevalence of insurance to cover the risk that an employee's spouse will contract an infection that originated at Our Lady's facility. *See D.S.W.*, 628 P.2d at 555. Because the court's opinion for the first time expands liability to protect employees' spouses from common infections, it is reasonable to assume that insurance rates do not currently reflect the cost of the risk. The court's opinion will therefore at best increase the cost of insurance for health care providers, and at worst create a liability for which they cannot insure. In either case, this factor does not favor the imposition of liability.

## III. CONCLUSION

No other jurisdiction has concluded that health care facilities owe a duty to protect employees' spouses from staph or other common infections that do not present a risk of serious harm. Such a duty has only been imposed in the case of rare or dangerous diseases. I would preserve the distinction.[13] Furthermore, because it is impossible to establish causation between the plaintiffs' inju-

---

contact moist body substances. Be sure to wash hands before and after caring for EACH patient even if you were wearing gloves." Review of this policy is included in mandatory training sessions for Our Lady's staff.

12. I will only discuss the burden here. As discussed in my analysis of the fifth *D.S.W.* factor, I believe that extension of the duty will not prevent future harm. Thus, I conclude there will be no beneficial consequences to the community.

13. Because the question of how uncommon or severe a disease must be before a duty is imposed is not before us, it need not be answered here.

ry and the defendant's conduct, because the court's opinion will do little if anything to prevent future harm, and because the defendant will potentially be exposed to unduly burdensome liability, I believe that the *D.S.W.* factors do not weigh in favor of imposing a duty under the circumstances presented here. I therefore respectfully dissent from the court's opinion.